

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## AP-74,829

### DAVID SANTIAGO RENTERIA, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 20020D00230 IN THE 41st DISTRICT COURT
### EL PASO COUNTY

**KEASLER, J., delivered the unanimous opinion of the Court.**

### O P I N I O N

Renteria was convicted in September 2003 of capital murder.[1] Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced Renteria to death.[2] In October 2006, we

---

[1] TEX. PENAL CODE § 19.03(a).

[2] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(g).

affirmed the trial court's judgment as it related to Renteria's conviction, reversed it as it related to his punishment, and remanded the case to the trial court for a new punishment hearing.[3] Following the new punishment hearing in May 2008, the trial judge again assessed Renteria's punishment at death. Renteria now raises forty-nine issues on direct appeal from the second punishment hearing. After reviewing Renteria's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment.

## I. Sufficiency for Future-Dangerousness

In his second point of error, Renteria challenges the legal sufficiency of the evidence to support the jury's affirmative answer to the future dangerousness special issue.[4] When reviewing the legal sufficiency of the evidence to support the jury's answer to this special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed, beyond a reasonable doubt, that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[5]

The State presented evidence of the capital offense at the punishment trial. Renteria was convicted of murdering five-year-old Alexandra Flores, who Renteria had kidnapped from a Walmart store in El Paso on November 18, 2001. The Walmart video surveillance

---

[3] *Renteria v. State,* 206 S.W.3d 689 (Tex. Crim. App. 2006).

[4] TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1).

[5] *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

depicted Renteria exiting the store with Flores at approximately 5:15 p.m. A security video from a 7-Eleven store in El Paso showed Renteria buying two thirty-two-ounce cans of beer at 9:00 that night.

Flores's nude, partially burned body was discovered in an alley the next day. A partially burned plastic bag covered her head. The medical examiner testified that Flores had two separate bruises on her skull that indicated two separate blows on opposite sides of her head. He concluded that Flores died from "asphyxia due to manual strangulation" and that "she was dead when she was burned." He testified that an extreme amount of force was applied when Flores was strangled "because she had more hermorrhage than many cases [he had] done on strangulations." He found no evidence of sexual assault but explained "that doesn't mean that she was not touched." He found pieces of orange wedges in Flores's stomach, and he opined that she probably ate the oranges within three hours of her death. Evidence showed that Renteria had bought oranges earlier that day, and he was at the Walmart with his van when Flores disappeared. A gasoline container was discovered in Renteria's van. DNA extracted from blood stains found in the van was consistent with Flores's DNA. Renteria's palm print matched a latent palm print on the plastic bag that was covering Flores's head when her body was found.

The State also presented evidence of Renteria's troubles with the law in the years leading up to the instant offense. In 1992, he committed the offense of indecency with a child. The victim of that offense testified that Renteria molested her in her home when she

was seven years old. She testified that Renteria called her into the bathroom where he was sitting on the toilet with his pants and underwear pulled down. Renteria asked her to sit on his lap, told her "that his private area hurt and that he needed [her] to rub it for him," and touched her in her "private area in the front." They later "ended up on the floor," where Renteria unsuccessfully attempted to have intercourse with her and she saw him ejaculate. Afterward, Renteria told her "not to tell anybody" about their "secret." Renteria pled guilty to this offense in 1994 and was placed on deferred adjudication probation for ten years.

While on probation, Renteria committed three driving while intoxicated (DWI) offenses in 1995, 1997, and 2000. He pled guilty to the first two DWI offenses and was placed on probation for two years in both cases. He pled guilty to the third DWI offense, a felony, in September 2000, and was placed on shock probation for ten years. He was incarcerated for approximately three months and was released on community supervision in December 2000.

Renteria violated the terms of probation at various times by drinking alcohol, staying out past curfew, driving without a valid driver's license, traveling to Mexico, and being around children. He also failed to report to his probation officer at times. His participation in required sex-offender counseling was described as "inconsistent," "sporadic," and "enough just to get by." The evidence further showed that Renteria was dishonest with his sex-offender treatment counselor, his probation officers, and his employers. Norma Reed, his counselor, testified that Renteria initially admitted committing the indecency with a child

offense but then denied it until he was faced with possible termination from the program. When Reed administered an "Abel Assessment" test, Renteria scored 85% on the "social desirability" section, which indicated "a significant concern that he was likely not to be responding truthfully on the self-report portions [of the test]." Renteria informed Reed after the fact that he had been living with his eighteen-year-old pregnant girlfriend, and he admitted that he failed to tell his probation officer this information. When Renteria was employed at a parking lot less than a block away from a school, he informed probation officer Rebecca Gonzales that his employer was not aware of his indecency offense. Reed testified that Renteria informed her in 1999 that he had lost a job because he had lied about his criminal history on his job application. Martha Cortez, who was Renteria's probation officer from 1998 to 2001, described him as a "[b]elow average" probationer.

The State presented further evidence of incidents that occurred while Renteria was on probation. Sonia Monique Hayes testified about her encounters with Renteria when they worked together at GC Services. Hayes and Renteria met in April 1999 and began talking to each other at work and on the phone. During a phone conversation that took place a few days after they met, Renteria questioned Hayes about why she had left the break room at work to talk to a friend. Renteria told Hayes, "Well, you can have friends, but you have to clear it with me first." Hayes responded, "I don't have to clear anything with anybody." Renteria then stated, "Well, you're mine. You're always going to be mine, and if I can't have you, nobody can." Hayes became scared, threatened to call the police, and hung up the

phone. When Hayes attended a group outing with coworkers the next evening, Renteria kept trying to talk to her after she repeatedly told him to leave her alone. Hayes later filed a police report and a human resources complaint against Renteria. She did not see him again after he stopped working at GC Services in June 1999.

Kay Sequera testified about an incident that occurred in 2001, approximately seven months before the instant offense. Sequera, who had recently met Renteria and believed that he was "really good with kids," asked Renteria to pick up her three-year-old son from day care and take him to Peter Piper Pizza for a few hours while she was at work. When Sequera later called Renteria and asked him to bring her son home, he told her that he had taken her son to a horse ranch for a family member's birthday party. Sequera became nervous as the hours passed, despite the fact that Renteria called her several times and told her not to worry because her son was "having a good time" and "riding ponies." Sequera was "pretty upset" because Renteria did not bring her son home until 9:00 or 10:00 p.m. that night. Sequera testified that she did not know about Renteria's indecency offense, and probation officer Cortez testified that Renteria had denied being around children at that time.

Renteria argues that the State's evidence "essentially rehashed the circumstances of the murder and did not address the issue of future dangerousness beyond the circumstances of the murder." Renteria presented evidence at trial that he had no prior history of disciplinary offenses while incarcerated. Defense witness Frank G. AuBuchon testified that, if Renteria received a life sentence, he would be classified as a G-3 offender and housed in

a "level 5" maximum security facility. Forensic psychologist Dr. Mark Cunningham, who conducted a violence risk assessment of Renteria, acknowledged the probability that Renteria would commit acts of violence if he were "at large in the community." However, Cunningham concluded that there was "statistically a very low probability" that Renteria would commit acts of violence while in prison, based on factors such as his lack of disciplinary history, his age, his education level, his history of gainful employment, his history of "positive childhood activities," and his "continued relationship and correspondence and visitation with family members and other community members." Renteria contends that this evidence, combined with the fact that he would not have "access to young children" in prison, demonstrates that he does not pose any realistic threat of future violence if sentenced to life in prison instead of death.

That Renteria has a clean prison disciplinary record does not, by itself, resolve the future dangerousness special issue.[6] "This Court's case law has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat 'whether in or out of prison' without regard to how long the defendant would actually spend in prison if sentenced to life."[7] The future dangerousness special issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the

---

[6] *See Coble v. State,* 330 S.W.3d 253, 267-69 (Tex. Crim. App. 2010).

[7] *Estrada v. State,* 313 S.W.3d 274, 281 (Tex. Crim. App. 2010), *cert. denied,* 131 S. Ct. 905 (2011).

institutional restraints put on that person."[8] The appropriate focus is "the defendant's individual character for violence and the probability that he would commit acts of violence in whatever society he found himself."[9]

Further, that Renteria would not have "access to young children" in prison does not necessarily mean that he poses no threat of future violence. For example, we noted in another case that "[a] middle-aged serial killer of children is not subject to the 'aging out' of that predilection, but remains dangerous to children regardless of time spent in prison or age at the time of release."[10] And the evidence in this case supports a finding that Renteria is dangerous to an even broader range of potential victims than only young children, as demonstrated by his multiple DWI offenses and his threatening behavior toward his former adult female coworker Sonia Monique Hayes.[11]

Further, the circumstances of the offense "can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue."[12] Here, the evidence showed that Renteria abducted five-year-old Flores and used extreme force to strangle her. Then, in a particularly cold and brutal fashion, he

---

[8] *Coble,* 330 S.W.3d at 269.

[9] *Id.*

[10] *Berry v. State,* 233 S.W.3d 847, 863 n.5 (Tex. Crim. App. 2007).

[11] *See Estrada,* 313 S.W.3d at 283.

[12] *Bell v. State,* 938 S.W.2d 35, 41-42 (Tex. Crim. App. 1996).

dumped her naked body in an alley, set it on fire, and bought beer afterwards.

In sum, by the time Renteria murdered Flores, he had already committed indecency with a child and three DWI offenses, violated his probation on numerous occasions, frightened a female coworker with his jealous and possessive behavior, and upset another woman when he babysat her three-year-old son by failing to return him home until late at night. This escalating pattern of threatening behavior, violence, and disrespect for the law supports a finding of future dangerousness.[13] As a result, the evidence was legally sufficient to support the jury's affirmative answer to the future dangerousness special issue. Point of error two is therefore overruled.

## II. Limitations on Voir Dire Questioning

In point of error three, Renteria contends that the trial judge's "unreasonable and overly restrictive voir dire procedures denied [his] fundamental rights to empanel an impartial jury of his peers." He complains that the trial judge refused to permit him "to elicit answers to proper questions propounded for the purpose of discovering challenges for cause and for the intelligent exercise of peremptory challenges." He asserts that the trial judge improperly restricted voir dire on both "mitigating factors" and the "circumstances of the offense."

The trial judge has broad discretion over the process of selecting a jury.[14] The main

---

[13] *See King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

[14] *Barajas v. State,* 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).

reason for this is that, without such discretion, voir dire could go on forever.[15] We will not disturb a trial judge's decision regarding the propriety of a particular question absent an abuse of discretion.[16] A trial judge abuses his or her discretion only when a proper question about a proper area of inquiry is prohibited.[17]

Before the beginning of individual voir dire, defense counsel indicated his desire to ask prospective jurors "if there were evidence that there were more than one person involved in the commission of the offense, whether they . . . could consider that as a mitigating factor." The trial judge responded that asking whether "they could accept a specific fact as mitigating" was "not an appropriate question" under the law. The trial judge further stated:

> You can -- if -- if you want to put it in when you're addressing the juror, you -- you can ask him whether they would be open. You can reference perhaps certain evidence, but you cannot ask them whether they would be open to something. In other words, certain people would consider intoxication, problems as a child, you know, certain people would consider that mitigation, other certain people won't, you know. And -- but to ask -- go ahead and ask them whether those are the kind of things they can consider, I think would be inappropriate.

Defense counsel then stated, "I'll ask a question and if the Court allows it, you allow it. And if you don't, you don't. We'll live with it." The trial judge replied, "Sure. Okay."

When defense counsel questioned prospective juror Joaquin Rivera, the following exchange occurred:

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

Q.      Now, again mitigation evidence can be anything.  And you do not have to agree.  You -- as jurors, one juror may find one specific piece of information to be mitigating and another person might find something else to be different mitigation.  You're not going to be asked to agree as to that.

A.      Yes.

Q.      Mitigating can be -- there are several relevant factors.

        [PROSECUTOR]:  Objection, Your Honor, to contracting.  Improper question.

        [DEFENSE COUNSEL]:  Your Honor, we're entitled to voir dire on their views and opinions, if they can consider mitigation.  I'm just asking --

        THE COURT:  You can't go into any specific areas that would be considered mitigation.

        [DEFENSE COUNSEL]:  I would just ask to give examples not for purposes of motion for cause [but] so that we can intelligently exercise our peremptory [to] which we are entitled.

        THE COURT:  I'm not going to allow you to go into specifics.

        VENIREPERSON RIVERA:  I think I understood what mitigation means.

        [DEFENSE COUNSEL]:  And, Your Honor, for the record, I would like the record to reflect that at this time we would like to ask this juror if he'd consider mitigation which the Court has found to be relevant, such factors as drugs --

        [PROSECUTOR]:  Objection, Your Honor.

THE COURT:  If you're making a Bill, then you need to excuse the juror.

[DEFENSE COUNSEL]:  Can we go ahead and excuse the juror?

THE COURT:  Well, not right now.  At an appropriate time.

Shortly thereafter, defense counsel presented a bill of exception, outside of Rivera's

presence, to show the questions she desired to ask:

> [DEFENSE COUNSEL]: Your Honor, we would -- under the law we are entitled to have jurors struck for cause who cannot consider and give mitigation. We are entitled to jurors who can consider and give effect to specific mitigating evidence, and a juror must be able to consider the individual defendant's mitigation . . . the questions we would ask the juror would be:

> Could you consider the mitigating factor of a person with a drug problem.

> Could you consider the mitigating factor of a person with a way turbulent family history.

> Could you consider mitigation of a person, a defendant, with emotional problems.

> Could you consider mitigation of the defendant's background.

> Could you consider mitigation of the defendant's upbringing.

> Could you consider mitigation of the defendant's character.

> Could you consider mitigation of the defendant's character, good character.

> And could you consider mitigation of the circumstances of the offense.

>          \*         \*         \*

> And for the record we would ask that these are the questions we would ask each and every member of this venire under this subject.

In addition, while later questioning prospective juror Elizabeth Black, defense counsel

obtained a "running objection" regarding the specific questions she wished to ask of each

individual juror. Defense counsel reurged this objection multiple times during the voir dire proceedings.

A week later, defense counsel filed and presented to the trial judge a motion entitled "Propounded Specific Voir Dire Questions to Each Member of the Venire." In this motion, defense counsel sought permission to ask the following questions:

1. If you heard evidence of sexual assault of a child and indecency with a child, what are your views regarding the death penalty?

2. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you heard MATTERS of sexual assault of a child and indecency with a child, what are your views regarding the death penalty?

3. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and the Defendant has a previous conviction of indecency with a child, what are your views regarding the death penalty?

4. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, and the Defendant has a previous conviction of indecency with a child and felony driving while intoxicated, what are your views regarding the death penalty?

5. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, if you hear MATTERS of sexual assault of a child or indecency [with] a child, what are your views regarding the death penalty?

6. Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, and assume the most horrible of circumstance of the crime of capital murder, the worst you can think of for yourself, are you open

to consider mitigation circumstances?

7.    Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, if you hear MATTERS of sexual assault of a child or indecency [with] a child, are you open to consider mitigating circumstances?

8.    Assume that the defendant has been convicted of capital murder, of intentionally and knowing[ly] causing the death of a child under 6, and you and 11 others have found yes, the defendant is a future danger, and the Defendant has a previous conviction of indecency with a child, are you open to consider mitigation circumstances?

The trial judge "overrule[d] the motion" and "disallow[ed] Defense counsel being able to ask those specific questions."

Renteria argues that the trial judge abused her discretion by refusing to give him permission to ask the propounded questions included in his bill of exception (hereinafter referred to as the first set of proposed questions) and his written motion (hereinafter referred to as the second set of proposed questions).  However, these questions implicate the restrictions imposed by *Standefer v. State*, against commitment questions, and by *Barajas v. State*, against ambiguous questions.[18]

A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact.[19]  Such questions often ask for a "yes" or "no" answer, in which one or both of the possible answers commits a juror

---

[18]  *Standefer v. State,* 59 S.W.3d 177, 181-83 (Tex. Crim. App. 2001); *Barajas,* 93 S.W.3d at 39-42.

[19]  *Standefer,* 59 S.W.3d at 179.

to resolving an issue a certain way.[20]  An open-ended question may also be a commitment question if it asks a prospective juror to set the hypothetical parameters for his or her decision-making.[21]  Renteria's proposed questions tend to either directly or indirectly commit prospective jurors to resolve or refrain from resolving an issue in the case on the basis of one or more specific facts contained in the question.[22]

However, not all commitment questions are improper.[23]  When the law requires a certain type of commitment from jurors, the attorneys may ask prospective jurors whether they can follow the law in that regard.[24]  However, where the law does not require the commitment, a commitment question is invariably improper.[25]  For example, a prospective juror is not challengeable for cause simply because he or she does not consider a particular type of evidence to be mitigating.[26]  Thus, whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry.[27]  Renteria's first set of proposed questions were improper commitment questions because they specifically asked if the

---

[20]  *Id.*

[21]  *Id.* at 180.

[22]  *See id.*

[23]  *Id.* at 181.

[24]  *Id.*

[25]  *Id.*

[26]  *Id.*

[27]  *Id.*

prospective juror could consider particular types of evidence to be mitigating. Questions 1 through 5 in his second set of proposed questions were also improper because these ambiguously worded questions indirectly attempted to determine how certain facts would influence prospective jurors' deliberations and if they would give aggravating effect to certain types of evidence.[28]

For a commitment question to be proper, one of the possible answers to that question must give rise to a valid challenge for cause.[29] If a prospective juror was not "open to consider mitigation circumstances," as Renteria asked in questions 7 and 8 in his second set of proposed questions, then that prospective juror would be challengeable for cause.[30] However, a proper commitment question must contain only those facts necessary to test whether a prospective juror is challengeable for cause.[31] These particular questions were improper because they included facts in addition to those necessary to establish a challenge for cause.[32]

Further, we have held that a voir dire question that is so vague or broad in nature as to constitute a global fishing expedition is not proper and may be prohibited by the trial

---

[28] *See Sells v. State,* 121 S.W.3d 748, 756-57 (Tex. Crim. App. 2003).

[29] *Id.* at 182.

[30] *See* TEX. CODE CRIM. PROC. art. 35.16(c)(2).

[31] *Standefer,* 59 S.W.3d at 182.

[32] *See id.*

judge.[33] Question six in Renteria's second set of proposed questions falls within this category. This question, which asked prospective jurors "to assume the most horrible of circumstance of the crime of capital murder, the worst you can think of for yourself," was so vague and broad as to be improper.

The trial judge was within her discretion to prohibit defense counsel from asking these improper questions.[34] Point of error three is overruled.

In point of error four, Renteria argues that the trial judge improperly restricted his voir dire questioning of prospective juror Annette Brigham. He contends that, as a result, he was prevented from intelligently exercising peremptory challenges and challenges for cause, and he was denied his constitutional rights to due process and effective assistance of counsel.

During voir dire questioning by the prosecutor, Brigham acknowledged that she had been a victim of child molestation when she was in elementary school. However, Brigham stated that she "[did not] see a real correlation" between her past experience and the instant case. She also agreed that she could decide the case fairly based on the evidence.

During defense counsel's voir dire questioning of Brigham, the following exchange occurred:

Q.    Now, going back to your experiences as a young child and --

A.    Uh-huh.

_____

[33] *Barajas,* 93 S.W.3d at 39.

[34] *Id*. at 38.

Q.      That there are different kinds of cases, different kinds of experiences.  Again, that's why we're here.  Let's say hypothetically if this were a case of sexual assault of a child.  In that case, you probably would not be the best juror given your past experiences.

        [PROSECUTOR]:  Objection to the --

A.      Is that a question?

        [PROSECUTOR]:  -- culmination of the question.

Q.      [By defense counsel]  Yes.

        [PROSECUTOR]:  That's not relevant here, Your Honor.

        THE COURT:  Overruled.  You might ask her directly whether it be -- because of that, she could be a fair and impartial juror.

Q.      [By defense counsel]  Because [of] your past experiences, in a case in which the allegations solely are the sexual assault of a child or which allegations that there may be some evidence involving --

A.      Uh-huh.

Q.      -- sexual abuse of a child.

A.      Uh-huh.

Q.      How would that affect your ability to be impartial?

        [PROSECUTOR]:  Objection to the nature -- she's contracting.  Now, she's --

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  Your Honor, we're -- one, I'm -- we're allowed to ask hypothetical questions to -- to ascertain any biases they may [have] towards the law.  Additionally, we're allowed to ask questions if not for the sake of exercising peremptories and again, there may be evidence of such a nature in this case.  And given this juror's experience, as the Defense, we're entitled to ask if that would affect

her, bias her in any way?

THE COURT: Sustain the objection. Next question.

Defense counsel later asked Brigham: "And based on where you sit, given your experiences, given who you are, do you feel that there's anything that would affect your ability to sit as a juror and be impartial?" Brigham replied, "No." Brigham reiterated that she did not think that her past experience and the instant case were connected. She acknowledged that it would not be "pleasant" to sit as a juror in the instant case, but she agreed that she could be impartial and that she would listen to both sides before making decisions.

Following Brigham's voir dire, defense counsel challenged her for cause, arguing in part that "this juror cannot be impartial due to the fact that she has been sexually molested as a child." The trial judge overruled the challenge for cause. Defense counsel exercised a peremptory challenge against Brigham, and requested an additional peremptory challenge because she was "not able to fully voir dire with regard to [Brigham's] biases of her experiences as a sexually molested child" and she was "denied the chance to make this specific inquiry of the juror on the subject." The trial judge took her request for an additional peremptory challenge under advisement.

The trial judge refused to permit an open-ended question that asked Brigham to set the hypothetical parameters for her decision-making in a case specifically involving sexual

assault or sexual abuse of a child.[35]  But the trial judge limited her ruling to the form of Renteria's question and not its substance.[36]  In fact, the trial judge suggested that defense counsel instead ask Brigham directly whether she could be fair and impartial in light of her past experience.  Defense counsel later asked Brigham if, "given [her] experiences," there was "anything that would affect [her] ability to sit as a juror and be impartial."  By rephrasing the question, defense counsel was able to elicit whether Brigham could be impartial despite the fact that she had been sexually molested as a child.[37]  Point of error four is overruled.

In points of error five through eight, Renteria argues that the trial judge improperly restricted his voir dire questioning of prospective jurors Elizabeth Black, Anna L. Nava, Howard R. Bryan, and John Tobias.  He complains that the trial judge prevented him from asking these prospective jurors if they were "biased against specific evidence that the defense intend[ed] to introduce in mitigation."  He asserts that, as a result, he was unable to "intelligently exercise peremptory challenges and challenges for cause" and was "effectively deprived . . . of effective assistance of counsel."

In response to voir dire questioning by defense counsel, Elizabeth Black stated that she felt that the death penalty would be appropriate in a case in which a defendant murdered

---

[35]  *See Standefer,* 59 S.W.3d at 180.

[36]  *See Howard v. State,* 941 S.W.2d 102, 111 (Tex. Crim. App. 1996) (a defendant is not entitled to any particular form of question; rather, a defendant is authorized to ask "proper" questions in a particular area of inquiry).

[37]  *See id.* at 109 (finding no improper voir dire restriction when a trial court limited its ruling only to the form of the questions and not to their substance).

a woman in the course of committing aggravated sexual assault.  Defense counsel then continued to question Black as follows:

Q.     And you cannot think of anything that would mitigate that offense?

[PROSECUTOR]: Objection to contracting, Your Honor.

THE COURT: Sustained.

Q.     So at that point you would not go on to consider question two?

A.     I would go on to consider question two.

Q.     Oh, you would?

A.     That's another -- I was -- I was believing that that was another way of look [sic] at it again kind of thing.  So I would certainly consider it.

Q.     Okay.  And so you -- there is -- you can think of something without -- I'm not asking you what it is -- but you can think of something, some factor that in that case and those circumstances would cause you to say life penalty rather than death?

[PROSECUTOR]: Objection, Your Honor, to contracting.

THE COURT: Question number two asks about mitigating circumstances.  We can't go into the specifics.  But can you consider mitigating circumstances or a circumstance that would be sufficient to satisfy you it ought to be life rather than death.

VENIREPERSON BLACK: That's your question.  Right?  That's different than what he --

THE COURT: That's what the law says.

VENIREPERSON BLACK: Yes.  Yes, I can.  Yes, I can consider that.  Um-hmm.

Q.     So you're open to mitigating circumstances and to considering them, if you feel that they're mitigating, and giving -- considering to give a life

sentence rather than the death penalty under the -- having convicted somebody of murder and rape?

A.     I'm open to considering that.

*               *               *

Q.     Serious consideration.

A.     Right.

The prosecutor then asked Black if she could "honestly consider question number two" in a case where the defendant "committed a horrible murder," such as "death of a child under six, a brutal rape and murder, [or] murder of a policeman or a fireman in the line of duty." Black responded that she could consider mitigating circumstances, even if she found the defendant to be a future danger and knew that life in prison would result.

Defense counsel later made a bill of exception outside of Black's presence, stating as follows:

> And we would ask each and every juror if they could consider mitigation with regard to the defendant's drug problem, with regard to defendant's turbulent family history, with regard to the defendant's emotional problems, with regard to the defendant's background, with regard to defendant's upbringing, with regard to the defendant's character, with regard to the defendant's good character, with regard to the circumstances of the offense, with regard to any specific facts which may or may not include any other party involved.

The trial judge refused to allow defense counsel to ask these questions and granted "a running objection in that regard . . . [a]s to each individual juror."  After the trial judge overruled his challenge for cause against Black, defense counsel exercised a peremptory challenge against her.

As we previously stated, Renteria's proposed questions in his bill of exception were improper commitment questions because they specifically asked if the prospective juror could consider particular types of evidence to be mitigating. A prospective juror is not challengeable for cause simply because he or she does not consider a particular type of evidence to be mitigating.[38] Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry.[39]

It was also improper for defense counsel to ask Black, "And you cannot think of anything that would mitigate that offense?" That question was in reference to a hypothetical example of a rape and murder of an adult woman, whereas this case involved the murder of a child under the age of six. It asked Black to set the hypothetical parameters for her decision-making with regard to certain facts.[40] It attempted to elicit what kinds of evidence Black would consider mitigating with regard to a particular offense.[41] The trial judge did not abuse her discretion in prohibiting that question.[42] Point of error five is overruled.

We next turn to the voir dire questioning of prospective juror Anna L. Nava. During initial questioning by the prosecutor, Nava stated that she would not automatically vote for

---

[38] *Standefer,* 59 S.W.3d at 181.

[39] *Id.*

[40] *Id.* at 180.

[41] *Id.* at 181.

[42] *Barajas,* 93 S.W.3d at 38.

the death penalty because "there might be extenuating circumstances or mitigating circumstances." Nava asked if the jury could "still render a life sentence" in this case "if there are any mitigating circumstances or issues that are brought up." The prosecutor then explained the "two step process" by which the jury would answer the future dangerousness and mitigation special issues. When Nava expressed some confusion about the process, the prosecutor explained it further. Nava then agreed that, even if the jury had affirmatively answered the future dangerousness question, she would still be open to a life sentence and she would consider evidence of mitigating circumstances when answering question number two.

Defense counsel later questioned Nava about an answer on her juror questionnaire:

Q. A person is a product of his or her environment. That's question 42 and you disagreed with that. Would you tell us why you disagree with that statement.

A. I -- I think that's -- that's a cop out when people cite that as a result of certain consequences or certain actions they have taken. I grew up in my extended family. We all grew up in the same environment. And I've had cousins that are in trouble or, you know, that did drugs growing up. And my sister and my brother and I, we were over achievers and we grew up in the same environment. So that's why I tend to disagree with that. I think people use that as a crutch to say, oh, well, poor boohoo me. That's what I grew up in.

When defense counsel began to explain the mitigation special issue, the following exchange occurred:

Q. Question number two here asks the juror whether taking into consideration all of the evidence, including circumstances of the offense, the defendant's character and background, and the personal moral culpability.

There is a sufficient mitigating circumstance. Now, so are you telling us that -- that you would not consider [the] defendant's character and background to see if there's anything mitigating in there because of what you've told us about being a product of your environment.

[PROSECUTOR]: Objection, contracting.

THE COURT: Sustained.

Q.      You would -- you would not consider any evidence about being a product of your environment about [the] defendant's character and background as mitigation in this case, would you?

[PROSECUTOR]: Objection, contracting.

THE COURT: Sustained.

After additional discussion, defense counsel asked Nava the following question:

Q.      All right. Okay. Now -- and this asks you to take into consideration the defendant's character and background. Are you willing to do that and to [do that] honestly? Nobody says that you have to give up your philosophy, your feelings, the way you see life or your world view. Nobody says you have to give that up just to be on a jury. Right? Because it wouldn't be right. Now, you will or you won't. And if you won't, all you gotta say is I won't consider [the] defendant's character and background to see if there's anything mitigating. And if that's the way you feel, say it.

A.      That is the way I feel actually. Every time I read that sentence, I kind of glossed over that --

THE COURT: I'm sorry, let me understand. How is it that you feel about that? Could you or could you not consider the defendant's character and background.

A.      I -- I probably -- I could not.

When next questioned by the prosecutor, Nava expressed some confusion about the mitigation special issue. The prosecutor provided further explanation, and Nava responded:

Q. Okay. What you believe, I mean that, you know, that -- that's fine. But one statement that -- that question requires you . . . to look at it and that's part of it, his character and background. Are you telling me you're not going to look at it?

A. No, I'm just saying I'm going to listen to everything and I'm going to process it. Just like said [sic], mitigating for one juror could be mit -- could be a different level of mitigation for another juror.

Q. Okay. Like I said, you know, we can't ask you what you find to be mitigating or not. The thing that this question requires you [to do] is to keep an open mind and consider all that then decide based on that. Do you know what I'm saying? Not to be committed one way or another. Just to look at all the evidence.

Nava stated, "I can do that." And when the prosecutor asked her if she could consider "all the evidence," including "the defendant's character and background," Nava replied in the affirmative.

Defense counsel then continued to pursue his desired line of questioning:

Q. You told us you're solidly against using anything about your -- about a person's background, about how you grew up, your environment and all that is an excuse for any of your actions. You've told us that already.

[PROSECUTOR]: We're going to object to contracting. Because he's asking her, Judge, specific mitigating factors.

THE COURT: Sustained.

Q. Correct?

THE COURT: I'm going to sustain the objection.

\* \* \*

[DEFENSE COUNSEL]: Excuse me. I'm just -- that question's already been asked and answered. It's on the record that way that's the only

reason I ask it that way, Your Honor.

THE COURT: All right.

*          *          *

Q. When you're talking to [the prosecutor] and she asked you -- got you passed [sic] question one. Okay. You -- she asked you all right. Are you going to still -- are you still going to be open to a life sentence and you very clearly said I don't think I could be. Right?

A. I think that's when I was a little confused about the break down and then she spent a considerable amount of time explaining it to me.

Q. All right. And that's before you told us that there's [sic] parts of question two that you won't -- will not consider.

[PROSECUTOR]: Objection. That's a misstatement of what the juror said, Your Honor.

THE COURT: I'm going to overrule it. If you understand the question, then answer it.

Q. Right.

A. What I see on number two are several factors there. There's evidence including the circumstances of the offense --

Q. Yeah.

A. -- evidence, circumstances, defendant's character, moral background, personal culpability and mitigating circumstances. So would I have to look at number two and -- and find favor with all of those factors?

Q. Number two says whether taking into consideration all the evidence including the defendant's character and background. Now, that's where you -- where you told us that you would not go, correct?

A. If the only thing that is presented to me is just moral background --

[PROSECUTOR]: We're going to object, Your Honor. It's contracting.

THE COURT: I'm going to sustain it. We can't go -- we can't go into what supposedly the evidence would be. We can only talk to you about it very abstractedly unfortunately, Ms. Nava. So if you would keep it in that -- in that vain [sic]. And there's, you know, at any given case there's a lot of evidence that might come in, but we can't -- we can't speculate about what that would be.

A. No, I'm sorry. I don't understand the question.

THE COURT: Yeah. What number two -- and only you can tell us is whether you could by [sic] a fair juror. That's what we're looking for, somebody that could fairly listen to all the evidence and fairly consider the circumstances of the offense, the defendant's character, background and the personal moral culpability of the defendant. Right now we can't commit you as to what you would be in favor of or not. This is just that you would fairly consider the evidence given your background and experience and your views?

A. Yes, I can. And to me, all of those factors is -- are evidence whether they're presented to me. Am I making myself understood?

THE COURT: Next question.

Q. But you would not take into consideration the defendant's character and background, and personal moral culpability. That's where you stop?

[PROSECUTOR]: Objection, contracting.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Pass the juror.

The prosecutor questioned Nava again after this exchange, and Nava continued to affirm that she would be open minded and consider all of the evidence when answering the mitigation question. At the conclusion of Nava's voir dire, the trial judge overruled defense

counsel's challenge for cause, and defense counsel exercised a peremptory challenge against her.

The mitigation special issue asks the jury to determine whether, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life instead of death.[43] The trial judge did not restrict defense counsel from pursuing this proper area of inquiry. Defense counsel was permitted to specifically ask Nava if she could "consider the defendant's character and background to see if there's anything mitigating." And the trial judge also asked Nava if she "could fairly listen to all the evidence and fairly consider the circumstances of the offense, the defendant's character, background and the personal moral culpability of the defendant." To the extent that defense counsel attempted to ask Nava if she thought "being a product of your environment" was mitigating, the trial judge was within her discretion to prohibit that question. Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry.[44] Point of error six is overruled.

Renteria next complains about the trial judge's rulings with regard to the defense counsel's voir dire questioning of Howard R. Bryan, Jr. When initially questioned by the prosecutor, Bryan affirmed that he could keep an open mind and consider all of the evidence

---

[43] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(1).

[44] *Standefer,* 59 S.W.3d at 181.

when answering the mitigation special issue. When defense counsel questioned Bryan, the following exchange occurred:

Q. Now, back to your questionnaire, page nine. You answered to question 42, a person is a product of his or her environment. And you told us you disagree. Could you please elaborate on that for me?

A. I think environment is a factor in a person's nature, character, but I -- I think a more accurate statement is that a person . . . is a product of their environment plus their response to their environment.

I've known many people who grew up in very harsh environments who did not become harsh people. I've known siblings who grew up in the same families, sometimes even violent families, who came out to be very different people. So I think significant -- I think it's a -- an incomplete statement.

Q. Okay. And then so much as you mentioned growing up in a harsh environment in that sense that would be their background.

A. Right.

Q. And so when it comes to mitigating circumstances and evidence you are to consider with regard to question two you're asked to consider with all of the evidence including the circumstances of the offense, the defendant's character and background. Is their background that something that you cannot consider in terms of mitigation?

A. No. I -- I think it has to be considered. I think it has to be understood and considered, but I don't think it's an automatic predictor of a person's character or behavior.

Q. And how about with question number 43, a person who abuses drugs or alcohol is less responsible for his or her actions. And you disagree. Why is that?

A. Because I think -- I think people have the responsibility to decide to either use or -- or not use those substances. And in that way they are responsible for the outcome if they perform -- if they do something while they're in a compromised state. I think they're responsible for the choice.

Q.      And so would matters of addiction or alcoholism be something that you would not be able to consider as mitigation?

[PROSECUTOR]: I'm going to object, Your Honor, as to contracting.

THE COURT: Sustained.

[DEFENSE COUNSEL]: And, Your Honor, for the record, we're entitled to ask these questions under [*Standefer*].

Following Bryan's voir dire, defense counsel unsuccessfully challenged him for cause. Defense counsel then exercised a peremptory challenge against him.

The trial judge was within her discretion to prohibit defense counsel from asking Bryan if matters of addiction or alcoholism would be something that he would not be able to consider as mitigation. Again, whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry.[45] Point of error seven is overruled.

We next turn to the voir dire questioning of prospective juror John Tobias. In response to initial questioning by both the prosecutor and defense counsel, Tobias affirmed that he would keep an "open mind" after answering the future dangerousness question and that he would answer the mitigation question based on the evidence. After Tobias made this affirmation, defense counsel continued to question him on the topic of mitigation. Renteria specifically complains about the following exchange between defense counsel and Tobias:

Q.      Now, back to your questionnaire on page nine. Question number 42 you're asked [if] a person is a product of his or her environment. You disagreed with that statement. Could [y]ou tell us a little bit about that?

---

[45] *Id.*

A.      I think a person is a product of their upbringing, their parents first and foremost.  I think their environment takes a part of it, but I don't think that that determines where or what a person is going to turn out to be.  You have -- and I know people who have come from worse environments and they're successful people.  And I credit, you know, these peoples' parents, you know, as the reason because they were there with them . . . through their school years, they were there you know, encouraging them.  I think the mitigating factor in how we -- what we turn out to be has to do a lot with family, either your immediate family or your surrounding family.

Q.      And so with regard to the fact that in question number two, whether taking into consideration all the evidence including the circumstances of the offense, the defendant's character and background, can you consider the background in terms of a mitigating factor?

[PROSECUTOR]:  Objection to contracting.

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  Your Honor, they need to be open to all mitigation and any and all evidence.  So if there's a specific factor that the juror cannot keep an open mind tom [sic] then we would be entitled to pursue that line of questioning for a challenge.

THE COURT:  As you put the question, I'll sustain the objection.

Immediately following this exchange, defense counsel stated, "With regards to the factors in question two -- and one of them is the background -- you see how you need to be able to consider all those things when you're answering the question." Tobias replied, "Um-hmm." At the conclusion of voir dire, the trial judge overruled defense counsel's challenge for cause against Tobias, so defense counsel exercised a peremptory challenge against him.

To the extent that defense counsel attempted to ask Tobias if he thought a defendant's "background" was mitigating, the trial judge was within her discretion to prohibit that

question because whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry.[46] Further, the trial judge limited her ruling to the form of Renteria's question and not its substance.[47] By rephrasing the question, defense counsel was essentially able to elicit the desired information.[48] Point of error eight is overruled.

In points of error nine and ten, Renteria argues that the trial judge improperly restricted him from questioning prospective jurors Robert W. Crosby and Robert P. Tomes about parole eligibility. He contends that, as a result, he was "denied the ability to intelligently exercise his peremptory strikes" and "effectively deprived . . . of effective assistance of counsel."

After the prosecutor initially explained to Crosby that the jury's answers to the special issues could result in either life in prison or the death penalty, the following exchange occurred:

A.     I'm pretty sure I understand what the death penalty is.

Q.     Yes, sir.

A.     But I have a lot of doubt on that if I understand what life in prison is. Does life in prison mean life in prison without any chance of parole or does life in prison mean at some point in the future, parole would be considered?

Q.     Okay.

---

[46] *Id.*

[47] *See Howard,* 941 S.W.2d at 111.

[48] *See id.* at 109.

THE COURT: Yeah, in this case, those are matters that the jury cannot consider.

A. Okay.

THE COURT: It cannot, cannot be considered. And I guess the question would be -- would be -- that'd be something Mr. Crosby that would so be in your mind that would influence the way you decide the issues in the case?

A. No, I can answer the question as presented, but I -- it's just a -- something in my mind if that was part of my process --

THE COURT: Yeah, no, it's not.

A. Okay.

THE COURT: That's for -- that's for people in the other place --

A. Okay.

THE COURT: -- other places of authority.

A. Okay.

Crosby also affirmed that he could keep an open mind and consider both life in prison and the death penalty in a case in which the defendant was found guilty of murdering a child under the age of six.

Defense counsel then attempted to ask Crosby his thoughts about the possibility of parole:

Q. Okay. Now, you've told us that essentially and you were pretty emphatic about it now, we're talking about a life sentence here. Does that mean life sentence without the possibility of parole?

A. Yes.

Q.     And that's a -- that's a strong opinion to have about the law.

A.     Correct.

*          *          *

Q.     And I take it then that you're [sic] feeling about the law in that regard is it's the only good alternative, the only acceptable alternative to a death penalty in a capital case would be a life in prison without any possibility of parole?

[PROSECUTOR]:  Objection to contracting, Your Honor.

A.     I think --

THE COURT:  I'm going to sustain the objection.  Rephrase it.

[DEFENSE COUNSEL]:  Your Honor --

Q.     Okay.  Let me ask another question.  Well, I'm asking you if you agree, if you agree with a law that might provide for parole --

[PROSECUTOR]:  I'm going to object.

THE COURT:  I'm going to sustain the objection.

Defense counsel argued that since the jury would be instructed as to the applicable parole law, he was entitled to "question [the prospective juror] about that with regard to whether he can follow that law, whether he agrees with it and how it . . . would or might affect him in deciding the case." The trial judge pointed out that she had previously informed Crosby "that the jury is not allowed to consider how the parole law would have any [e]ffect in the case" and "[t]hat is a decision for other authorities to make." The trial judge continued to explain the issue and questioned Crosby as follows:

THE COURT: The Jury in a criminal case is informed and same as in this -- this capital case informed that [there] is a parole law. But they are not to be given [sic] any thought or consideration nor talk about how that law would be calculated or affect a particular defendant because that is a decision for other authorities to make. So they cannot consider it during deliberation. They can be informed of it that the fact there is possibly parole -- probability of parole. That eligibility does not mean that they get it. It's just they're informed of that they can't take into consideration.

*         *         *

And in [sic] the issue for the juror in this case is whether is that an issue of parole as you mentioned earlier when you were commenting whether that would influence you to such a degree that you would not follow the instructions of the Court and that's the -- that's the issue in the case. What would be your response to that, sir?

[CROSBY:] When I asked the question, I was trying to decide in my own mind whether if I had listened to the evidence and decided that life in prison was what I thought was best for the defendant, would I also have to be the one to decide whether he was going to be eligible for parole or whether it would be life without parole. I didn't know that and you answered the questions for me and now I understand it that somebody else makes that decision. I only make the decision of whether I think it's death or life in prison.

Defense counsel continued to insist that he was entitled to ask his proposed parole questions, and he moved for a mistrial on that basis. The trial judge denied defense counsel's motion for a mistrial. After the trial judge overruled a challenge for cause against Crosby, defense counsel exercised a peremptory challenge against him.

Renteria argues that parole eligibility is a proper inquiry for voir dire because "for offenses committed on or after September 1, 1999, of course, the jury is now instructed on

parole, if requested by the defense."[49]  A similar argument was raised in *Sells v. State.*[50]  In *Sells*, we assumed without deciding that the statutory change rendered questioning about parole permissible in some situations.[51]  Sells sought to ask the following four questions:

> 1.     Would the minimum length of time a defendant could serve in prison before he could be paroled be something you would want to know in answering the special issues?
>
> 2.     On which special issue would this be important?   How would this 40 year minimum sentence be important to you in answering the special issues?
>
> 3.     Would you be more likely, or less likely, generally, to view a defendant as a continuing threat to society if you knew he could not be paroled for a minimum of 40 years?
>
> 4.     What kind of evidence would you expect, as a juror, to help you in considering the 40-year parole ineligibility factor when answering the special issue?[[52]]

We held that these questions "implicate the strictures imposed by *Standefer* against commitment questions and by *Barajas* against ambiguous questions" and that "any attempt to commit prospective jurors to giving mitigating, aggravating, or even no effect to the parole instruction is impermissible."[53]

Renteria wanted to ask Crosby whether "the only acceptable alternative to a death

---

[49]  *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(2).

[50]  121 S.W.3d 748 (Tex. Crim. App. 2003).

[51]  *Id.* at 756.

[52]  *Id.* at 755.

[53]  *Id.* at 756-57.

penalty in a capital case would be a life in prison without any possibility of parole" and whether he "agree[d] with a law that might provide for parole." These proposed questions were similar to the questions at issue in *Sells*. Consequently, the trial judge did not abuse her discretion by prohibiting the proposed questions. Further, the trial judge ultimately asked Crosby whether he could follow the instructions with regard to parole. Point of error nine is overruled.

We next turn to the voir dire questioning of prospective juror Robert P. Tomes. In response to initial questioning by the prosecutor, Tomes stated:

> Q.     Okay. Now, the death penalty is only an option for someone convicted of capital murder. And even then, it's not an automatic. It's just one option that the jury can consider. The other option is life in prison. So really you only have two options where a person [is] convicted of capital murder. It's life in prison or the death penalty.
>
> A.     Is that life in prison without possibility of parole[?]
>
> Q.     Well, we can't get into --
>
> A.     Oh.
>
> Q.     -- that right now. So that's basically all I can tell you. The only options are life in prison or the death penalty.
>
> A.     Okay.

Defense counsel later questioned Tomes in the following exchange:

> Q.     Okay. Now, in your view, I take it that a life sentence without possibility of parole is the only reasonable range of punishment with -- with the death penalty?
>
>      [PROSECUTOR]: Objection, Your Honor. Improper -- improper

question.

THE COURT: Sustained.

Q. You started asking about parole, is that correct?

A. Right. Yes, I asked her the possibility of life -- is there life without parole.

Q. All right. And if you're not told that as a juror --

A. Uh-huh.

Q. -- then you won't know, it's going to affect you in your verdict in deciding whether to go with a life sentence or not?

A. Yes. Yeah, I guess it probably would just based on what I hear and, you know, what I would find out in the court.

Finally, the trial judge explained to Tomes that "the jury would be instructed as to a parole law . . . but they are not permitted to calculate, analyze or anything to try to apply that parole law in their decision." The trial judge asked Tomes if that would influence his verdict, and Tomes stated that it would not. Tomes also replied in the negative when the trial judge asked him if he would be "tempted to try to calculate" or "figure out things." The trial judge overruled a challenge for cause against Tomes, and defense counsel exercised a peremptory challenge against him.

Renteria's question to Tomes—whether "a life sentence without possibility of parole is the only reasonable range of punishment"—is essentially the same question he asked of Crosby—whether "the only acceptable alternative to a death penalty in a capital case would be a life in prison without any possibility of parole." As discussed in point of error nine, this

is an improper commitment question, and the trial judge was within her discretion to prohibit it. Further, defense counsel was ultimately permitted to ask Tomes if the possibility of parole would influence his verdict. Point of error ten is overruled.

### III. Denial of Challenges for Cause

In points of error eleven through thirty-seven, Renteria alleges that the trial judge improperly denied his challenges for cause against eighteen veniremembers: Robert Wynn Crosby; Jeanette Sanchez; Evangeline Rose Ramirez; Anna L. Nava; Carlos Martinez; Howard R. Bryan, Jr.; Daniel Gurany; Cruz Angel Ochoa, Jr.; Longino Gonzalez, Jr.; Robert Paul Tomes; Mark Robert Williams; Mark Anthony Tapia; John Tobias; Paul Steven Watt; John David Turner; Leslie D. Potter; John P. Deslongchamps; and, Washington Watley, Jr.

To establish harm, Renteria must show that he asserted a clear and specific challenge for cause.[54] He must also show that he used all his peremptory strikes, asked for and was refused additional peremptory strikes, and was then forced to take an identified objectionable juror whom he would have struck had the trial court granted his challenge for cause or granted him additional peremptory strikes.[55] Renteria complied with these requirements with regard to the venirepersons addressed below.

When the trial judge errs in overruling a challenge for cause against a venireperson, the defendant is harmed if he or she uses a peremptory strike to remove the venireperson and

---

[54] *See Green v. State,* 934 S.W.2d 92, 105 (Tex. Crim. App. 1996).

[55] *Lewis v. State,* 911 S.W.2d 1, 4 (Tex. Crim. App. 1995).

thereafter suffers a detriment from the loss of the strike.[56]  Because Renteria received seven

additional peremptory challenges, he can demonstrate harm only by showing that the trial

judge erroneously denied at least eight of his challenges for cause.[57]

When reviewing a trial judge's decision to deny a challenge for cause, we review the

entire record to determine if there is sufficient evidence to support the ruling.[58]  We give

great deference to the trial judge's decision because the trial judge is present to observe the

demeanor and tone of voice of the venireperson.[59]  When a venireperson's answers are

vacillating, unclear, or contradictory, we accord particular deference to the trial judge's

decision.[60]

**Robert Wynn Crosby**

Renteria argues that Crosby was biased against a law applicable to the case upon

which he was entitled to rely.[61]  To support his claim, Renteria points to a statement made

by Crosby during defense counsel's voir dire questioning:

> Q.     All right.  And so if you heard evidence, having found that
> somebody is a future danger, you heard evidence that you consider mitigating
> --

---

[56] *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex. Crim. App. 1986).

[57] *See Chambers v. State,* 866 S.W.2d 9, 23 (Tex. Crim. App. 1993).

[58] *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

[59] *Id.*

[60] *Id.*

[61] TEX. CODE CRIM. PROC. art. 35.16(c)(2).

A.     I haven't heard the mitigating evidence yet.

Renteria asserts that Crosby "gestured toward the Prosecution" when he made this statement, but this is not reflected in the record.  Based solely on this exchange, Renteria contends that Crosby was "substantially impaired in his ability to consider mitigating evidence and to consider the full range of punishment" because he indicated that "he sides with law enforcement and he was not going to listen to any mitigating evidence unless he hears it from the State."

The entire record of Crosby's voir dire provides sufficient evidence to support the trial judge's denial of Renteria's challenge for cause against Crosby.  Before the statement described above, defense counsel asked Crosby if he would automatically assess the death penalty after answering the future dangerousness question affirmatively.  Crosby answered, "No, because I still have to answer the second question."  In response to the prosecutor's questioning, Crosby indicated his understanding that neither the State nor the defense had the burden to prove mitigation.  He agreed that he could consider the mitigation question after answering the future dangerousness question affirmatively regardless of whether his answer resulted in life in prison or the death penalty.  Despite indicating on his juror questionnaire that he was in favor of the death penalty in general, Crosby stated that he could keep an "open mind" and could consider both life in prison and the death penalty in the instant case.  He also agreed that he would not automatically believe law enforcement witnesses.

The trial judge did not abuse her discretion in denying Renteria's challenge for cause.

Renteria has not shown that Crosby had a bias that would have substantially impaired his ability to carry out his oath and instructions in accordance with the law.[62]

## Jeanette Sanchez

Renteria asserts that Sanchez was biased against a law applicable to the case upon which he was entitled to rely.[63] He specifically contends that Sanchez "expressed a presumption and an inherent personal bias towards the death penalty and an inability to consider the full range of punishment."

Sanchez first stated that she understood the prosecutor's explanation of the procedures for determining punishment. She responded affirmatively when the prosecutor asked her if she could keep her "mind open to life in prison and the death penalty at each step in that process." She stated that, even if she answered yes to the future dangerousness question, she would not automatically assess the death penalty because she would "still want to . . . take into account other circumstances."

Sanchez, however, gave different responses when she was next questioned by defense counsel. Defense counsel first asked Sanchez what would happen if she answered the future dangerousness question affirmatively, and she responded as follows:

Q.     Okay. And -- and so you get to question one and assume hypothetically that you're convinced, yeah. Well, yes.

A.     Uh-huh. Correct.

---

[62] *Feldman,* 71 S.W.3d at 744.

[63] TEX. CODE CRIM. PROC. art. 35.16(c)(2).

Q.      Is that the end or have you stopped?

A.      If I'm convinced that the evidence says that he is going to be a threat?

Q.      Yeah.

A.      And I answered yes?  Yes.  That's it, that's the end.

Q.      That's the end of what?

A.      My understanding is we go no further.

Q.      No further than that?

A.      And that's the death penalty.

Q.      Your understanding is that once you find future danger, that's the end of the line?

A.      Uh-huh.

Q.      Okay.  All right.  Now, are you telling me that based on the fact that -- that that's the way you feel, that if I find that somebody is a future danger, I think he ought to get a death penalty?  Are you saying it because of that or are you saying it because you think that that's the way it's been presented to you, that you stop the inquiry there?

A.      No, I think --

Q.      Did you understand my question?

A.      I think I understand.  You're saying do I personally believe this or is this just because this is what I've been told that that's --

Q.      Yes.

A.      -- the end of the line.

Q.      Yes.

A.     No, I personally believe that I am, through this whole process, am getting this -- this information.  So I think that I don't have to necessarily get to point -- to question two if I have been strongly convinced of question one.

*          *          *

Q.     On finding -- once again, I'm going to go over it again.

A.     Uh-huh.

Q.     Upon making your determination that beyond a reasonable doubt the accused will probably commit criminal acts of violence that would constitute a continuing threat to society, prison society or otherwise --

A.     Correct.

Q.     -- that that's the end of the line for you?  That's a death penalty case for you period?

A.     Yes.

Q.     You're not going to make any further consideration beyond that?

A.     If that's what I'm required to do by law, that's exactly how far it goes, but I'm happy with that --

Q.     Do you --

A.     Decision.

Q.     Do you think that that's what you're required by law to do?

A.     I think that's what I've been instructed to do that I should weigh all the evidence and decide that whether he would -- whether based on the evidence that they present, if I'm convinced that he will be a threat to society as a whole.

Q.     Okay.  Now, you're saying that based on your understanding of what the law requires you to do, you think if you say -- answer yes to question one, that that's the death penalty?

A.    Yes.

Sanchez next added that in her "personal view" she "would have to eliminate mitigating circumstances" before assessing the death penalty. When defense counsel asked Sanchez at what point she would consider the mitigation question, she responded:

> I think I would -- that would be a consideration from me from the very beginning. I think if I even had a nagging suspicion or a nagging -- something nagging me, it would not make me answer yes to number one if upon hearing their evidence there was something there, I wouldn't have said yes on number one.

Sanchez added that "basically what [she] understood [was] that once you say yes to the first one, you really don't have to go to the second question." Defense counsel again explained the process for determining punishment, stating that "the jury cannot assess a death penalty without going on to consider question two," and that "there's no death penalty unless all of the jurors say no, there is no sufficient mitigating circumstance to warrant a life sentence rather than the death penalty." Sanchez agreed that was clear to her. Defense counsel then questioned Sanchez as follows:

> Q.    Okay. Now, I'm going to ask you again. If you're on the jury and you're considering the evidence and it's -- it has convinced you --
>
> A.    Uh-huh.
>
> Q.    -- that this accused person is going to be a threat to society in the future because of criminal acts of violence, okay. Is that the end of the -- of the line for your inquiry in the case about the death penalty?
>
> A.    As far as I'm concerned?
>
> Q.    Yeah.

A.      Yes, because it's my responsibility to just vote for myself if I say yes, I say no.  If I'm convinced, I say yes and I'm done.

Q.      So you're still at the point where if you say yes to future danger, that's a death penalty period.

A.      If I say yes, I guess because it is a collective -- we have to have 12 agreements --

Q.      Yes.

A.      -- then I guess, but for me p[e]rsonally, if I said yes --

Q.      Right.

A.      -- I don't have to take it a step further unless everybody else has voted and we have two people that disagree.

Next, the prosecutor again explained the process for determining punishment, and Sanchez repeatedly stated that she understood the process.  In the following exchange with the prosecutor, she expressed her understanding and explained the logic behind her previous statements to defense counsel:

Q.      Now, what I thought you said is that okay, we've -- we're -- now, we've all 12 agreed.  We're looking at number two, but I don't really need number two because I'd already decided they're are [sic] a future danger and they ought to get the death penalty.  Is that what you said?

A.      No, it's because I think I was misunderstanding because I'm thinking that there are other people that are in disagreement [on number one].

Q.      Got it.  Okay.

A.      Not --

Q.      So if we're all in agreement on one --

A.      If we're all in agreement on one, we then have to look at the next step.

Q.      Two.

A.      Right, to see if there's mitigating circumstances or if there's some little magic detail that -- that's just bugging us about it that's not or not us in general but just something maybe [sic] bothering me or something may be bothering somebody else about the case.

Q.      Right. And if you find that circumstance and then at least 10 people find such a circumstance, whatever it is, then you answer the question yes --

A.      Uh-huh.

Q      -- and what results?

A.      If we answer to the bottom --

Q.      To number two yes.

A.      -- to number two yes, that warrants the life imprisonment, then he would be life imprisonment would be --

Q.      Right.

A.      -- the result.

Q.      And if all 12 find no circumstance --

A.      Then it's back to the death penalty.

Sanchez further clarified her understanding as she explained the process for determining punishment in her own words. She stated that "if all 12 of us agree that he will be [a future danger], we have to then go down to number two and revisit all the evidence again . . . to see if there's anything that anybody objects to . . . any little nagging detail that they may have thought this may have been a mitigating circumstance." She added, "If we decide there that

there are no mitigating circumstances, then it's the death penalty." And she also acknowledged that all twelve jurors must find no mitigating circumstances and that "it has to be unanimous" to result in the death penalty.

Finally, defense counsel asked Sanchez, "[I]f you get to question two . . . are you willing to consider elements of the defendant's character and background to see if there's any mitigating circumstance there that would warrant a life sentence rather than a death penalty?" Sanchez responded in the affirmative. Defense counsel then challenged Sanchez for cause because "[s]he stated several times that once she had determined that there was a yes answer to the future danger question, that was the end of the inquiry and that was the death penalty case." Defense counsel further argued that the prosecutor failed to sufficiently "rehabilitate" Sanchez. The trial judge denied the challenge for cause, finding that "from the totality of the inquiry of the State and Defense that the juror understands the process" and that "she understands what's required of her under the law." The trial judge denied defense counsel's request for additional peremptory challenges. Defense counsel protested that Sanchez was an objectionable juror that he would have struck if the trial court had granted him another peremptory challenge. Sanchez was seated on the jury.

The trial judge's ruling is supported by the totality of the record. Sanchez ultimately stated that she understood and could follow the law with regard to the mitigation special issue. Thus, the trial judge did not abuse her discretion in denying Renteria's challenge for cause.

**Carlos Martinez**

Renteria argues that Martinez was challengeable for cause for two reasons. First, he contends that Martinez "would place the burden of proof on the defense as to mitigation." However, we have held that a veniremember is not challengeable for cause simply because he would place the burden of proof for mitigation on the defense.[64] Second, he complains that Martinez "would require [the] defendant to testify in violation of the Fifth Amendment to the United States Constitution."

The prosecutor initially explained that a defendant has a Fifth Amendment right not to testify, and Martinez indicated that he understood that concept. Martinez agreed that if a defendant chose not to testify he could put that out of his mind and decide the case just based on the evidence in front of him. He understood that the defense did not have to present any witnesses at trial. He also acknowledged that the State had the burden of proof on the future dangerousness issue and that neither party had the burden of proof on the mitigation issue.

When defense counsel next asked Martinez if his religious beliefs would affect his answers to the special issues, Martinez stated that it would depend "on the reaction of the defendant, if he has any remorse toward what he's done." Defense counsel continued to question him as follows:

> Q. Before you decide to put him to death you're going to have to hear him get up on the stand and testify and say that he is remorseful. Is that correct?

---

[64] *Saldano v. State,* 232 S.W.3d 77, 92 (Tex. Crim. App. 2007).

A.     No.  I don't have to.  No.  I just -- it's whatever, you know, I hear from -- with -- well, the evidence.  You know, if -- I don't know if he -- if we get to hear what he has to [say] about how he feels.  I don't know.  Like this is my first time.  So --

Q.     I understand.  Okay.  Well, you reviewed a moment ago with the prosecutor about the fact that every person accused of an offense has the right not to testify, not to take the stand.

A.     Uh-huh.

Q.     And the bottom line, not to present any evidence.  The reasoning -- did you understand the reason for that?  The reason for that is because the burden of proof is on the State.

A.     Okay.  I understand what you're saying.

Q.     And the State has to convince you beyond a reasonable doubt that somebody's a future danger.  Before you can -- you know, before you can even consider a death penalty the State has the burden of proving that beyond a reasonable doubt.

A.     Yes.

Q.     Do you understand that?

A.     Yes, sir.

Q.     Okay.  So I'm asking you if before you consider a life sentence --

A.     Um-hmm.

Q.     -- you have to hear testimony from the accused or evidence from the defense about his remorse.

A.     Well, I think -- I think it would help.  I mean that would help to make a decision, you know.

Q.     And if you did not hear that evidence you would be in favor of a death penalty?

A.    I feel I probably wouldn't have any choice, you know, based on the evidence.

Q.    Based on -- on conviction of knowingly and intentionally killing a child under six and finding that he's a future danger, if you did not hear testimony or evidence of any kind from the defense that the accused was remorseful, you would automatically impose the death penalty?

A.    Yes.

When the prosecutor next questioned Martinez on this issue, Martinez stated that he was okay with the defendant not testifying and that he would not hold it against him "[a]s long as the evidence is clear." He agreed that he could follow the law and answer the special issues based on the evidence in such a way that a life sentence would result, even if the defendant did not testify.

Finally, the trial judge questioned Martinez on this issue:

Q.    Mr. Martinez, earlier when [defense counsel] asked you about that, what I heard you say is that it would be easier or something to the effect that it would be easier for you if you heard from the defendant or some evidence from them.  What -- what did you mean?

A.    Well, I mean, I know it's his right to take the Fifth Amendment. Right?  But I think it helps to hear how he feels about -- it would help me to decide how he -- about either the death penalty or life in prison if I heard.  I think it would be helpful if he had any remorse for what he did.

Q.    And if --

A.    But it's not possible.

Q.    If you didn't, is that going to affect you -- this is something I need to really ask you to think about.  Is that going to affect you when you're trying to decide?  Is that going to be the turning point for you?  I mean what -- how do you feel?  How is that going to affect you?

A.    Well, if the evidence is clear and there's you know --

Q.    What if it's not clear?

A.    Well, I would have to go -- if it's not clear, I would have to go with life, you know, if it's not clear enough.

Q.    Even if you didn't -- even if you didn't hear from the defendant . . . or heard evidence from them and . . . you're not sure . . . are you going to hold it against the defendant for not testifying?  Or are you going to tend to go, well, since I didn't hear from him maybe I ought to go for the other side even though I'm not sure?

A.    No.  I'd have to be positive that I -- you know, that there's enough evidence to make a decision, both sides, either life or death.

Q.    Because the Fifth Amendment, I mean, if you -- if you take into consideration that the defendant didn't testify, then the law is just like it shouldn't even be on the books, I mean . . . it's not worth anything.  It is our law.  But you would -- if a person gives effect to the fact that a person didn't testify it's like -- it's like it doesn't mean anything, you'd just be throwing that right out the window.

        So that's why I need to ask you to look at your conscience and see whether that would . . . bother you so much that if the defendant didn't testify that . . . you'd tend to hold it against him?

A.    No, I -- I wouldn't.  I mean if it's -- that's his right.  I just have to weigh the evidence.

Defense counsel challenged Martinez for cause, arguing that he would automatically impose the death penalty if the defendant did not testify or present evidence of remorse.  The prosecutor responded that once the law was explained to Martinez, he said he could follow the law and that "he would not expect to hear from the defense and [he would] decide just based on the evidence."  The trial judge denied the challenge for cause, and defense counsel exercised a peremptory challenge against Martinez.

The trial judge's decision to deny the challenge for cause is supported by the totality of the record. Although Martinez vacillated when questioned by the prosecutor and defense counsel, he ultimately affirmed, when questioned by the trial judge, that he could follow the law and that he would not hold a defendant's failure to testify against him. When a venireperson vacillates, we defer to the trial judge, who was in the best position to evaluate the venireperson's responses.[65]

### Howard R. Bryan, Jr.

Renteria claims that Bryan was challengeable for cause because he was biased against the defense. He specifically contends that Bryan "expressed a bias that he would favor the State because they have the law enforcement officers as witnesses." A juror who cannot impartially judge the credibility of the witnesses is challengeable for cause for having a bias or prejudice in favor of or against the defendant.[66]

The prosecutor initially explained to Bryan that the law asks jurors to "not prejudge any class of witnesses" and to "put everyone on the same level until you hear what they have to say." Bryan agreed that he could follow the law. The prosecutor asked, "Do you think that you would be inclined to automatically believe a law enforcement officer?" Bryan replied, "No, I don't." The prosecutor later revisited this issue in the following exchange:

> Q.      On page 37, number 205, we asked if you would automatically
> believe the testimony of a law enforcement officer, and you said no but that

---

[65] *Feldman,* 71 S.W.3d at 744.

[66] *Id.* at 745; TEX. CODE CRIM. PROC. art. 35.16(a)(9).

you would tend to believe them. And then the next question, 206, would you favor the side that had law enforcement as witnesses, and you said yes.

A.      (Nods head).

Q.      We talked a little bit about this earlier --

A.      Yes.

Q.      -- in discussing how jurors should be able to address witnesses regarding their credibility. And what I need to know is if -- if you're going to be able to keep an open mind regardless of a class of witness that testifies as to whether or not they are telling the truth or telling a lie. Are you able to keep an open mind on that?

A.      Yes, I think so. I -- I would tend to believe a law enforcement officer.

Q.      Okay.

A.      And my feeling about that are -- is a couple of things. Number one, I think mostly their role would be a disinterested person. I mean they're not necessarily -- they're not a person involved in the activities that are being considered.

Q.      Okay.

A.      And number two, the people I've known who are law enforcement officers were really good observers. They are careful about what they see and making mental notes of things. And so I -- I would tend to think that they would be very careful in relating what they see and know and experience maybe more than the average person and certainly more than a person who has a kind of vested interest.

Q.      And so I think you're saying that based on the officer's training in learning to be aware and observe and do all that -- you can take into consideration their training, certainly.

A.      Right.

Q.      The issue is with all of that, let's suppose that you hear an officer

and you don't believe them.  Can you accept that, okay, this officer is lying to me?

A.      I can, yes, ma'am.

Q.      And it happens.  Would you agree with that?

A.      It's happened to me.

Q.      Okay.  Then you know.

A.      I do, yes.

Q.      Okay.

A.      And I -- for me, the personal involvement is a key thing here.

Q.      Okay.

A.      I mean I -- I know law enforcement people who have said to me something I either knew at the time or later discovered was not true but it was because I had a personal involvement --

Q.      All right.

A.      -- rather than an objective, disinterested observation.

Q.      Okay.  And the bottom line here is that you're keeping an open mind and not automatically believing or disbelieving.

A.      (Nods head).

Q.      Can you do that?

A.      Yes, ma'am.

When defense counsel next questioned Bryan on this topic, he responded as follows:

Q.      Now, let me get you back to page 37, question 206.  When you answered your questionnaire on October 10th, when you didn't have anybody, I guess, picking on your answers, you told us you were in favor of the side that

had law enforcement officers as witnesses.  Correct?

A.     Correct.

Q.     And so will you agree that an extension of this answer is, as the State, they have the cops for their witnesses.

A.     Right.

Q.     So based on that you are going to favor the State because they have the law enforcement witnesses.  Correct?

A.     Correct.

Q.     And so your opinion based on this is that you have a tendency to favor the State.  Correct?

A.     Well, I have a tendency to put greater credence in what a law enforcement officer is going to say because of their training as an observer and because of the fact that they in my experience are people interested in uncovering truth.

Q.     So law officers kind of get a head start in your opinion in terms of credibility.  Is that correct?

A.     I -- let me see if I can say this appropriately in a way that I'm really comfortable with.  I wouldn't say they have a head start, but I would say that -- my experience is that most people don't just give their testimony, they kind of plead their case.  And I'm talking -- I'm not talking about legal things, I'm talking about all kinds of human circumstances.  And my experience is that law enforcement officers tend to be people who -- who make assessments on the basis of what they personally observed or what evidence they uncover, that sort of thing.

Q.     But you will -- but you keep saying --

A.     I think they're more objective is my statement.

Q.     Okay.  And you do tend to -- you would tend to -- you would tend to favor the side with the law enforcement officers?

A.     Yes.

Bryan further clarified his answers when he was again questioned by the prosecutor:

Q.     In that regard, Mr. Bryan, you're not going to automatically believe law enforcement simply because they are law enforcement?

A.     No.

Q.     You're not suggesting that you favor the side with law enforcement -- which in most cases is the State, not always -- but that you would favor that side and so you're going to do whatever the State wants. Is that not -- that's not what you're saying either, is it?

A.     That's not what I'm saying, no.

Q.     If the evidence shows you that you should do something contrary to what the State is asking you for, will you be able to make that decision?

A.     Yes, ma'am.

Q.     Regardless of law enforcement involvement?

A.     Yes, ma'am.

Following this exchange, defense counsel challenged Bryan for cause, arguing that Bryan "clearly stated that he would favor the State." The trial judge denied the challenge for cause, and defense counsel exercised a peremptory challenge against Bryan.

A defendant is entitled to jurors who will be genuinely open-minded and subject to persuasion, with no extreme or absolute positions regarding the credibility of any witness.[67] However, a venireperson who is "simply more or less skeptical of a certain category of

---

[67] *Feldman,* 71 S.W.3d at 747.

witness" is not subject to a challenge for cause.[68]  Although Bryan expressed a tendency to be less skeptical of law enforcement witnesses, he explained that he would keep an open mind and that he would not automatically believe them.  The entirety of the voir dire supports the ruling of the trial judge, who was in the best position to evaluate Bryan's responses.

### Daniel Gurany

Renteria asserts that Gurany was biased against a law applicable to the case upon which he was entitled to rely.[69]  When the prosecutor initially asked Gurany why he indicated in his juror questionnaire that he thought there should be a death penalty, he responded:

> Growing up I didn't feel the death penalty was necessary in the United States.  I always felt maybe because that's what guided me towards education is that through education, we could alleviate and educate our communities and our people too to not have a death penalty as a necessary option.  As I've grown older, I see stuff in the newspaper.  I see horrendous crimes.  I've changed my view in that and think that there's some people that are not able to rehabilitate into the normal society.  Either education has failed them, their parents have failed them.  They have failed themselves.  So I think in some cases the death penalty is required.

Defense counsel next questioned Gurany on the topic:

> Q.      Okay.  Now, when you were talking about your responses to question 45, you -- you mentioned there are certain circumstances in which -- in which education has failed an individual, his parents failed, [he] has failed himself and you indicate that's where you thought the death penalty should be considered.  Am I quoting you fairly?
>
> A.      I did say those words, but not the context of people behave a certain way based on their upbringing, their education or lack of education, but that

---

[68]  *Id.*

[69]  TEX. CODE CRIM. PROC. art. 35.16(c)(2).

doesn't mean they automatically have to commit a crime.

*       *       *

Q.      Okay.  Now, you were talking about education having failed an individual, and parents having failed him, and having failed himself.  If you look up here.  Assuming you've already been convicted [sic] beyond a reasonable doubt that somebody is probably going to do something in the future, assuming that, you are directed to take into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant to see if there's sufficient mitigating circumstance.  Are you willing to consider information about the defendant's character and background to see if you find something mitigating?

A.      I -- I --

[PROSECUTOR]: Objection to contracting.

THE COURT: Overruled.

A.      I am.

Defense counsel later challenged Gurany for cause, arguing as follows:

We challenge for cause, Your Honor.  This juror cannot be impartial because it's his opinion that character and background under circumstances where an individual's education failed them, and parent's [sic] failed them and he failed himself would be sufficient for a death penalty for him, which means that he's taking mitigating circumstances and twisting them into aggravating circumstances.  He's not able to consider things that are by law mitigating and ought to be considered, and he cannot be fair.

The trial judge overruled the challenge for cause and defense counsel exercised a peremptory challenge against Gurany.

The trial judge did not abuse her discretion in denying the challenge for cause. Renteria has not shown that Gurany had a bias that would have substantially impaired his

ability to carry out his oath and instructions in accordance with the law.[70] Gurany agreed that he was willing to consider Renteria's character and background in determining whether there were sufficient mitigating circumstances to warrant a sentence of life rather than death. Even if we were to assume that Gurany would not consider Renteria's educational, parental, or personal failings to be mitigating, he was not challengeable for cause on that basis.[71]

### Cruz Angel Ochoa, Jr.

Renteria claims that Ochoa was challengeable for cause "because he expressed a presumption and an inherent personal bias towards the death penalty and an inability to consider the full range of punishment." He contends that Ochoa had "such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict."[72]

The trial judge initially questioned Ochoa about statements in his juror questionnaire that he heard about the case in the news and already formed an opinion about what the punishment should be. Ochoa responded in the negative when the trial judge asked him if this would influence his verdict if he were seated as a juror. Ochoa explained that his answer on his juror questionnaire was an "emotional response" from what he had heard on the news, and he agreed that he could listen to the evidence and return a verdict based on the evidence

---

[70] *Feldman,* 71 S.W.3d at 744.

[71] *Standefer,* 59 S.W.3d at 181 (a prospective juror is not challengeable for cause simply because he does not consider a particular type of evidence to be mitigating).

[72] *See* TEX. CODE CRIM. PROC. art. 35.16(a)(10).

alone.

When next questioned by the prosecutor, Ochoa acknowledged that he would not automatically find Renteria to be a future danger because he had been found guilty of intentionally killing a child under age six. He agreed that he could put aside everything that he had previously heard about the case and base his verdict solely on the evidence presented in the courtroom. He further agreed that, even if he found Renteria to be a future danger, he would still have an open mind to both life in prison and the death penalty. He acknowledged that he answered that he was in favor of the death penalty on his juror questionnaire. However, he explained that this was a general statement and that the punishment should be decided based on the facts and circumstances of each case. He also agreed that he was not predisposed towards the death penalty and was still open to both life and death in the instant case.

Defense counsel and Ochoa then had an exchange regarding his juror questionnaire:

Q.      And on page 3 of your questionnaire you had told us that you had heard when asked have you heard anything about this case and or the defendant and you answered yes.

A.      Yes.

Q.      What do you remember hearing about this case?

A.      I remember about a child being missing and that was later found dead. And then later Mr. Renteria was -- was charged and taken into custody. And -- and that it had been a molestation. Okay.

Q.      And the second question on this questionnaire was do you already have an opinion about what the punishment should be? And you answered

yes, correct?

A.      No.

Q.      You answered yes on this question?

A.      Oh, that's -- that was in regard to in general.

                    *              *              *

Q.      Okay.  So on October 10th you had an opinion about what the punishment should be, correct?

A.      That's when I filled out the questionnaire.

Q.      Okay.  And now, you -- you come here today to follow up on these questions and so we can talk to you.  And you've told us that it was an emotional response and so you're [sic] opinion was based on that.

A.      Yes.

Q.      Okay.  Now, given that you do have an opinion, based on that opinion, would you have to be talked out of your opinion?

A.      No.

Q.      Okay.  So whatever you heard on the news, on the media and your opinion that you formed, you're telling us in no way is it going to influence your verdict if you're seated as a juror?

A.      That is correct.

Q.      Now, let me --

A.      Can I state why?

Q.      Sure.

                    *              *              *

A.     It's because I believe in the law.  And we can all form lynching squads and go out and find whoever did something and we have an opinion.  I mean, you've never had opinions when you've been out there.

Q.     Right.

A.     And you feel like killing -- I mean not killing, but like ringing [sic] somebody's neck or something, but that's your opinion at that time.  But once you settle down and listen to what happened, you say well, maybe that wasn't really the rational thing to do.  So that is what I'm telling you right now.  When I said that, that was because I walked in.  I found out what the case was about.  I had heard about it in the television and the newspaper and I felt again the same thing that you -- when you become emotional.  But there's another side that wants [sic] you have to sit in court, you have to set aside your emotions.  You have to listen to the case which I've done before.  I have to base it on what -- what is presented to me and I have to make my decision on that.

*          *          *

Q.     And again, my concern is because you've had that opinion twice.  You had it back in 2001 or whenever you were first hearing about it and you had it again when you walked into Liberty Hall on October 10th.  And so you've had that, these tense emotional reactions twice.  And so when it comes [to] being charged with following the law, some people, that opinion is just something that's too strong for them.

A.     Right.  And you asked me if -- if you had to talk me out of it.  I said no.

Q.     Okay. [A]nd so you can honestly walk into the courtroom, put aside your opinion, blank slate and move forward?

A.     Yes, because I really -- you know, if I serve [on] this jury or not it is -- it is not that important to me.

Q.     Okay.

A.     I mean, I'm just telling you what I fe[e]l.

Defense counsel later asked Ochoa about his "views on the death penalty" for a

defendant who had been convicted of murdering a child under age six.  Ochoa responded, "I would say yes to the death penalty," but he also added that he would not have to be "talked out of" the death penalty.  Defense counsel continued to question him as follows:

> Q.    Now, the question is if a situation in which a person has already been convicted of intentionally, knowingly causing the death of a child under six years old and you have found that he is a future danger that he will commit criminal acts of violence that constitutes a continuing threat to society, at that stage, what are your views regarding the death penalty?
>
> A.    Okay.  You're implying I'm already saying that he is a future threat?
>
> Q.    Yes, that's my hypothetical question.  He's been convicted, intentionally, knowingly killing a child under six and he has been found to be a future danger.  What are your views regarding the death penalty?
>
> A.    Okay.  You're setting up scenarios for me?
>
> Q.    Yes, sir.
>
> A.    That I'm supposed to ans[w]er?
>
> Q.    Yes, sir.
>
> A.    And I feel cornered.
>
> Q.    I'm sorry.
>
> A.    So I'd rather not answer it.
>
> Q.    Unfortunately we need answers.
>
> A.    Yes?
>
> Q.    Yes.
>
> A.    Yes.

Q.     Yes.  Death penalty?

A.     Yes.

Q.     Okay.

A.     I mean, I'll give you an answer.

When next questioned by the prosecutor, Ochoa acknowledged that he had said there should be a death penalty for a defendant who murdered a child under age six, but he added that he was still open to life in prison.  Then, he confirmed to defense counsel that in his view a defendant who murdered a child under age six should get the death penalty.  Finally, the trial judge questioned Ochoa:

> THE COURT: Okay. [J]ust a concern on my part that I want to just absolutely be clear on and that's you view this question and know he's already been convicted.  You're sent to the deliberation room and you're going to answer these two questions and -- and she asked you about tendencies.  Honestly, these -- all right.  A tendency to go toward death rather than life?
>
> A.     No.
>
> THE COURT: When you're answering these questions --
>
> A.     No, I didn't have a tendency.
>
> THE COURT: Okay.  All right.  And if you -- if you decided with all the rest of the jurors that the answer would be yes that he is a future danger.  At that point is there later a -- a tremendous leaping on your part, tendency that really you're not going -- you're not going to -- you're not going to find any sufficient mitigating circumstance.  And as a result, death penalty results?
>
> A.     No, I consider myself fair and I would consider in two [sic].

Defense counsel then challenged Ochoa for cause because he could not "be impartial

and consider a life sentence," he had already decided that the death penalty would be appropriate for a defendant who murdered a child under six, and he would assess the death penalty if the defendant was found to be a future danger. The trial judge overruled the challenge for cause to Ochoa, and defense counsel exercised a peremptory challenge against him.

The trial judge did not abuse her discretion in denying the challenge for cause. Although Ochoa vacillated in his answers, he ultimately stated that he would not favor the death penalty and would consider mitigating circumstances. When a venireperson vacillates in his answers, we accord particular deference to the trial judge's decision.[73]

### Longino Gonzalez, Jr.

Renteria claims that Gonzalez was challengeable for cause for the same reasons as Ochoa. He contends that Gonzalez had "a presumption and an inherent personal bias towards the death penalty," an "inability to consider the full range of punishment," and a "conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict."

The trial judge initially questioned Gonzalez about his answer on his juror questionnaire that he had formed an opinion on punishment after hearing about the case in the news. The trial judge asked Gonzalez if this would influence his verdict if he were seated as a juror, and Gonzalez answered:

---

[73] *Feldman,* 71 S.W.3d at 744.

I spent a lot of time from when we got called in the first time avoiding the opportunity of going through or considering in my mind what was about to come so that I would not have a prejudgment on what would be my decision if I got called to serve. So I was trying to avoid it at that time even though I marked this yes because up to this point from what I had gathered, newspaper and television, yes, I had marked it a yes because at that point not knowing that I would serve, of course, I would. Yes.

The trial judge asked him again if his prior opinion would influence his verdict, and Gonzalez responded: "No, I think I would want to hear the details before making a a [sic] conclusion."

Gonzalez next affirmed to the prosecutor that he would have an open mind on punishment, that he could put aside what he had heard about the case on the news, and that he would base his decision on the evidence presented in court. Gonzalez agreed that there is a place for the death penalty and a place for life in prison and that he was open to both options in the instant case. He confirmed that even if he answered yes to the future dangerousness question, he would still be open to a life sentence and would consider evidence of mitigating circumstances.

When defense counsel asked Gonzalez if his prior opinion about the case would influence his verdict, Gonzalez replied that he "would want . . . to hear the facts." Defense counsel continued to question Gonzalez as follows:

Q. Okay. Now, my question was just generally speaking based on your values, your views, your experiences, generally speaking with regard to the situation which somebody has been convicted of capital murder and killing a child under six years old, and you've already indicated that you felt there was a -- and the -- I don't think results in a previous case involving children by your general views, in regard to the case which someone has intentionally

caused the death of a child under si[x] years old, what do you personally believe with regard to the death penalty?

A. At that time?

Q. Right now. I mean how are you right now? Just what's your snap fingers what do you think about that situation?

A. Well, in that situation is from what you're defining or reading, you're saying that capital murder of a child under the age of six.

Q. Yes. That that --

A. I am stating that my opinion is death penalty.

Q. Yes, sir.

A. Right.

Q. Yes, sir. I'm trying to clarify that.

A. Yes. Then up to this point I am going to say yes.

Q. Your opinion is death penalty?

A. Yes.

Q. Okay.

                    *          *          *

A. Now, I have stated before that I would have the ability to separate because I don't know the facts. Do you understand what I'm saying?

Q. So let me go ahead and ask you. That's your opinion, death penalty. So now you're going to try to separate facts, but basically what you're going to try to do is separate facts to -- to have to be talked out of the death penalty is the situation?

A. No, I don't think so.

Q.      Would be no?

A.      No, I don't think so. I don't see it that way. The way I see it is that in other words, I already know that there has been a conviction. I already know that.

Q.      Yes, you do.

A.      Okay. Now, my view now has to be to mak[e] a decision as to what is being asked there and I cannot make a decision until I hear the facts.

Q.      Okay.

A.      In other words if I had not been called to be in the situation, my opinion would have stayed -- stayed in that manner.

Gonzalez later stated to defense counsel that he generally thought that the death penalty "needs to be applied" if a defendant murdered a child under age six and was found to be a future danger. However, he added that he could still consider a life sentence for such a defendant. He then confirmed to both the prosecutor and defense counsel that he would be open to both a life sentence and the death penalty and would honestly and fairly consider mitigation evidence in making that decision.

Defense counsel challenged Gonzalez for cause, arguing that he was biased in favor of the death penalty and that he could not give full and honest consideration to the mitigation special issue. The trial judge overruled the challenge for cause, and defense counsel exercised a peremptory challenge against Gonzalez.

The trial judge's decision to deny the challenge for cause is supported by the totality of the record. Although Gonzalez expressed that he would generally support the death

penalty for a defendant who murdered a child under age six, he repeated several times that he was open to a life sentence and that he could consider mitigating evidence in the instant case. The trial judge did not abuse her discretion in denying the challenge for cause.

**Mark Williams**

Renteria also alleges that Williams was challengeable for cause because he expressed "an inherent personal bias towards the death penalty and an inability to consider the full range [of] punishment." He further contends that Williams had established a conclusion in his mind about Renteria's guilt that would influence his verdict.[74]

In response to initial questioning by the trial judge and the prosecutor, Williams acknowledged that, although he had heard about the case through the media and conversations with others, he had not reached a conclusion about what punishment would be appropriate. He also agreed that he would base his verdict solely on the evidence presented in the courtroom.

Williams next stated to defense counsel that he was generally in favor of the death penalty for a defendant who murdered a child under age six, but he did not have an opinion about what the punishment should be in the instant case because he had not yet heard the evidence. He stated that, in the event that he found a defendant to be a future danger, he would lean towards the death penalty but he "would still want to hear the mitigating circumstances." He affirmed that his impression when he first heard about the case was

---

[74] *See* TEX. CODE CRIM. PROC. art. 35.16(a)(10).

"how bad the crime seemed to be." However, when defense counsel asked him if that impression would influence his verdict, he responded: "No, sir, because I haven't heard the evidence." Defense counsel then continued to question him as follows:

Q. You're saying that you can -- that you can completely ignore what you've already taken pretty seriously to heart and just ignore it completely?

A. Up until the point I'd been called as a juror on this trial I'd totally forgotten about it. So I have not thought about it in the last three or four years, whatever it's been.

Q. But when you remembered --

A. Um-hmm.

Q. -- how you reacted to hearing about it you remembered that it was a--

A. Yes, I did.

Q. -- very strong impression, and it came back to you the same impression?

A. Yes, sir.

Q. And when you get into the jury room, that impression is going to come back, isn't it? I mean when you -- when you search deep down in your heart you're not -- you can't escape that?

A. I -- I don't know if it will or not.

Q. You're not sure that it will or not?

A. I don't know.

Q. Okay. Because you're not anymore [sic] sure of that than you are about not using some of your own knowledge on things when it might conflict with what some expert says from the witness stand. Right?

A.    Correct.

Q.    And you're not sure you can set that aside completely.  At this point you cannot tell us honestly from your heart of hearts that you -- that that's not going to influence you?

A.    I can't rule it out one hundred percent, no.

When the prosecutor next questioned Williams on this topic, he responded as follows:

Q.    And you said if you go back to the jury room, of course, you're human.  You know, we have memories, and we can't forget everything. Right?

A.    Right.

Q.    And you said it might come back.  And which is fine.  But the question is, you know, if it comes back, though . . . can you still decide those questions just based on the evidence?

A.    Yes, I think I can.

Q.    And not on that impression?

A.    Correct.

Q.    Okay.  So that impression, even if it comes back, it wouldn't have an effect on your decision?

A.    I don't believe it would.

Q.    Okay.  You don't believe it would.  It would or will not?

A.    It will not.

When again questioned by defense counsel, Williams stated he believed he could "get past" his impression and base his verdict on the evidence presented at trial.   He acknowledged the possibility that he could not one hundred percent set his impression aside,

but he believed that he could "get past it" and "be impartial."

Defense counsel argued that Williams was challengeable for cause because he could not be impartial and was unsure whether his negative impression would influence his verdict. The trial judge overruled the challenge for cause, so defense counsel exercised a peremptory challenge against Williams.

Williams stated during voir dire that he could not say with one hundred percent certainty that his impression of the case would not influence his verdict, but he ultimately affirmed that he could set it aside and base his verdict on the evidence presented at trial. When the record reflects that a veniremember vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge.[75] We decline to hold that the trial judge abused her discretion in denying the challenge for cause to Williams.

### Mark Anthony Tapia

Renteria asserts that Tapia was biased against a law applicable to the case upon which he was entitled to rely.[76] He specifically complains that Tapia "shifted the burden of proof and imposed it on the Defendant with regard to mitigation."

A veniremember is not challengeable for cause simply because he or she would place

---

[75] *Gardner v. State,* 306 S.W.3d 274, 295 (Tex. Crim. App. 2009), *cert. denied,* 131 S. Ct. 103 (2010).

[76] TEX. CODE CRIM. PROC. art. 35.16(c)(2).

the burden of proof on mitigation on the defense.[77]  Further, Tapia expressed that he would keep an open mind on punishment, that he would consider mitigating circumstances before making his decision, and that he would not hold the defense to any burden.  The totality of the voir dire provides sufficient evidence to support the trial judge's ruling.

### John Tobias

Renteria argues that Tobias was challengeable for cause because he would automatically assess the death penalty for certain crimes.  He contends that Tobias expressed "an inherent personal bias towards the death penalty and an inability to consider the full range [of] punishment."

When the prosecutor initially questioned Tobias about his juror questionnaire, Tobias responded as follows:

> Q.      On page eight of your questionnaire you're being asked whether you believe there should be a death penalty, and you said yes.  Now why do you believe that?
>
> A.      There's certain crimes in my mind that that [sic] are committed where I believe, if he is the person, should pay with their life.
>
> Q.      Okay.
>
> A.      If it's -- I mean I know that there's different types of crimes and stuff.  I mean there's just certain things that go over and beyond in my mind.

The prosecutor then stated to Tobias that, although the death penalty is an option in capital murder cases, that "doesn't mean that it's an automatic."  The prosecutor then explained the

---

[77]  *Saldano,* 232 S.W.3d at 92.

process in which the jury must answer the future dangerousness and mitigation special issues. Tobias indicated that he understood the process and that he could answer both questions based on the evidence, regardless of whether his answers resulted in life in prison or the death penalty. Tobias stated, "I don't favor the death penalty over a life sentence," and he agreed that he had an open mind with regard to both options at every stage of the proceeding. Tobias acknowledged that he could still keep an open mind for a defendant convicted of murdering a child under age six.

When he was next questioned by defense counsel, Tobias stated that in his personal opinion certain crimes "should result in the death penalty" and the death penalty should serve "as a deterrent to certain crimes." Tobias asserted that, despite his personal opinion, he would still keep an open mind with regard to answering the future dangerousness question. Tobias also stated that even if he found the defendant to be a future danger, he would keep an open mind and answer the mitigation question based on the evidence presented at trial.

Defense counsel challenged Tobias for cause, arguing that he was "not impartial" because he believed certain crimes deserved the death penalty and he could not give full consideration to the special issues. The trial judge overruled the challenge for cause, and defense counsel exercised a peremptory challenge against Tobias.

The trial judge's ruling is supported by the record. Although Tobias expressed a general belief in the death penalty as a deterrent to certain crimes, he continually stated that he had an open mind and that he could answer the special issues based on the evidence.

Thus, the trial judge did not abuse her discretion in denying the challenge for cause.

**Paul Watt**

Renteria claims that Watt was challengeable for cause for two reasons. First, he alleges that Watt "would place the burden of proof on the defense as to mitigation." However, Renteria did not specifically challenge Watt on this basis.[78] Further, we have held that a veniremember is not challengeable for cause simply because he would place the burden of proof on mitigation on the defense.[79]

Renteria also argues that Watt was challengeable for cause because he would require a defendant to testify in violation of the Fifth Amendment to the United States Constitution. When the prosecutor initially explained a defendant's right not to testify, Watt agreed that he would not hold it against a defendant if he did not take the stand and would not require the defense to prove anything at trial. However, Watt stated that he would want to "hear both sides of the story" before making a decision. The prosecutor reminded him that the State has the burden to prove future dangerousness, that the defendant has a right not to testify, and that the defense has a right not to put on any evidence. Watt stated that he could follow the law and hold the State to its burden even if the defense did not present any evidence.

When next questioned by defense counsel, Watt agreed that remorse and accepting responsibility are very important factors to consider when determining if someone should

---

[78] *See* TEX. R. APP. P. 33.1.

[79] *Saldano,* 232 S.W.3d at 92.

receive the death penalty. Watt stated that he would expect to hear something about a defendant's intent and motivation for his actions. He added, "I would like to understand what happened to know if I would consider that they would do it again." However, he stated that he would not hold it against the defense if they presented no evidence. He affirmed that he could answer the future dangerousness question even if he heard nothing from the defense on that issue. He further affirmed that he would not expect the defense to present evidence of mitigating circumstances.

Defense counsel challenged Watt for cause on the grounds that he needed to hear from both sides before making a decision, he indicated that remorse would be a factor in his decision, and he was biased against a defendant's Fifth Amendment right to remain silent. The trial judge overruled the challenge for cause, and defense counsel exercised a peremptory challenge against Watt.

The trial judge's ruling is supported by the record. Although Watt stated that he would want to hear about a defendant's remorse, responsibility, intent, and motivation, he consistently stated that he would not hold it against the defendant if he did not testify. He stated that he could follow the law and answer the special issues even if the defense did not present evidence at trial. The trial judge did not abuse her discretion in denying the challenge for cause.

The trial judge did not abuse her discretion in denying Renteria's challenges for cause to Crosby, Sanchez, Martinez, Bryan, Gurany, Ochoa, Gonzalez, Williams, Tapia, Tobias,

and Watt. Because Renteria has failed to show that at least eight of his complained-of challenges for cause were erroneously denied, he cannot show harm on appeal.[80] Points of error eleven through thirty-seven are overruled.

### IV. Cumulative Voir Dire Error

In point of error thirty-eight, Renteria alleges that "the cumulative effect of all the alleged instances of [the] trial court's errors during the jury selection process injected reversible error into the trial" and denied him due process. This Court has recognized the proposition that a number of errors may be found harmful in their cumulative effect; however, we have rejected each of Renteria's voir dire points of error individually. Without error, there is no cumulative effect.[81]

Renteria further asserts in point of error thirty-eight that one of "the alleged instances of the trial court's errors during the jury selection process" occurred when the trial judge deprived him of due process and due course of law "by permitting the State to inform the veniremen that [the] law required a nexus between the crime and mitigation evidence." This complaint is not included in any of his other specifically enumerated points of error. Renteria has provided no citation to the record or legal authority in support of this claim. Thus, it is

---

[80] *Chambers,* 866 S.W.2d at 23.

[81] *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

inadequately briefed,[82] and we decline to address it. Point of error thirty-eight is overruled.

## V. Exclusion of AuBuchon's Testimony

In point of error forty-one, Renteria claims that the trial judge erroneously excluded "relevant testimony by Frank G. AuBuchon that David Renteria would not commit criminal acts of violence in the future and would not be a continuing threat to society." He contends that AuBuchon's testimony was admissible as either expert or lay testimony. He asserts that the exclusion of this testimony violated his "federal constitutional right to due process, his state constitutional right to due course of law, and his Sixth Amendment right to present a defense at the sentencing phase of his trial."

Defense witness AuBuchon, who had been employed in the prisoner classification section of the Texas Department of Criminal Justice for nearly twenty years, reviewed Renteria's prison records before testifying at trial. AuBuchon testified at length regarding prison classification and security measures and how they would be applied to Renteria. AuBuchon testified that he was not concerned that Renteria would be a threat to prison inmates or staff because "he doesn't have any history of institutional misbehavior, violence, [or] acts of aggression." When defense counsel further questioned AuBuchon about future dangerousness, the prosecutor objected and the trial judge ruled as follows:

> Q.    And all right. Does this mean, if you talk about the word probability meaning more likely than not --
>
> A.    Okay.

---

[82] TEX. R. APP. P. 38.1.

Q.      Is there a probability that David Renteria will commit criminal acts of violence so that he constitutes [a] continuing threat to society in the future?

[PROSECUTOR]: Objection, Your Honor.  Calls for a conclusion.  It is the province of this jury to determine and he's not been qualified as an expert in this area.

[DEFENSE COUNSEL]: Your Honor, his credentials have made him obviously an expert in corrections and an expert in judging character and the potential danger of inmates.

[PROSECUTOR]: Furthermore, the definition of probability is within the jury's province to determine.  His probability may not be the same as the jury's.

THE COURT: Sustained.

Immediately thereafter, defense counsel asked AuBuchon the following question:

Q.      Mr. AuBuchon, from your point of view as a corrections officer and classification officer and classification direction and operations director in the Texas Department of Corrections Institutional Division, does David Renteria pose a threat of violence to inmates or staff at TDC?

A.      I don't believe so.

Following that exchange, defense counsel twice more asked AuBuchon his opinion on Renteria's future dangerousness in prison:

Q.      So why do you say that he will not be a risk of harm to the staff or the inmates of TDC?

A.      I'm saying that based on the review of his records and the total absence of disciplinaries in his history.

*          *          *

Q.      Is he a danger to the people in prison and to society down there?

A.      I don't think so.

The prosecutor withdrew her previous objection at the bench the following morning:

[PROSECUTOR]: The other thing, there was a question yesterday wherein defense [counsel] defined probability and then asked do you think there is a probability that the defendant would be a continuing threat to society. I objected to the definition of probability. But I would not object to them asking the question as it's phrased in the two special issues, that is, is there a probability that David Renteria would commit criminal acts of violence so that he constitutes a continuing threat to society. I would not object to that question as I do believe that's a proper question even for a lay person to answer.

So that the record is clear, if the defense wants to ask that question before passing the witness or has other questions that they want to ask, I want to make sure it's clear, I will not object to that as long as there's no defining of probability.

[DEFENSE COUNSEL]: If I ask him the question, I would ask him to distinguish between the word possibility and the word probability.

[PROSECUTOR]: Which I think is a -- there's some definition there, Judge. I -- the question as it is phrased I think is the appropriate way to ask the question as it's phrased in the Court's charge and in the Code.

THE COURT: Well, I'm not going to tell anyone how to ask a question at this point in time. Ask your questions, raise your objections, if you have any.

[PROSECUTOR]: I'm just saying we withdraw our objection as to asking the question as it is in the Code.

THE COURT: Well, that wasn't the objection yesterday. The objection was to the definition that the attorney had placed on the word probability.

[PROSECUTOR]: Yes, ma'am.

THE COURT: So let's proceed.

Defense counsel then proceeded to ask AuBuchon his opinion regarding Renteria's future

dangerousness in prison:

> Q.     And is David Renteria a future danger in prison?  Is he -- is he going
> to commit -- knowing what you know of him and knowing where he's going
> to be is he going to commit criminal acts of violence that constitute a threat to
> that society over there?
>
> A.     Not that I'm aware of.

*          *          *

> Q.     After all, after all, do you consider that David Renteria is going to be
> a threat of violence, of criminal acts of violence in the future that he will be a
> continuing threat to society in -- where he's going to be in prison?
>
> A.     In the prison I don't -- I don't see that.  I don't see any evidence or
> see anything in his -- in his past institutional behavior that would make me
> think that.

Renteria argues on appeal that the trial judge "abused [her] discretion in refusing to

allow Mr. AuBuchon's testimony, as to, whether there was a probability that David Renteria

will commit criminal acts of violence so that he constitutes [a] continuing threat to society

in the future."  He contends that "[t]his error harmed [him] by preventing him from

presenting persuasive evidence that would have shown the jury that he was not a future

danger and that, as a result, would have saved his life."

Even if we assumed that the judge erred, no harm is shown.[83]  AuBuchon repeatedly

testified that he did not believe that Renteria would be a future danger in prison.  In addition,

---

[83]  *See* TEX. R. APP. P. 44.2.

defense witness Dr. Mark Cunningham testified that there was "not a probability" that Renteria would commit criminal acts of violence in prison if he were to receive a life sentence instead of the death penalty. Renteria was not prevented from presenting the evidence at issue. Point of error forty-one is overruled.

## VI. Fifth Amendment

In point of error forty-two, Renteria alleges that "the State was allowed to use [his] invocation of his right to remain silent as substantive evidence against him in violation of the Fifth Amendment." He specifically complains that, during the cross-examination of forensic psychologist Dr. Mark Cunningham, "the State was allowed to prove that defendant and his attorneys refused to allow defendant to be questioned by [Cunningham] regarding the facts of the capital murder offense." He contends that the State's adverse use of this evidence was constitutionally impermissible.

During voir dire examination outside the presence of the jury, Cunningham testified regarding the future dangerousness special issue. Cunningham affirmed that he was "engaged to give testimony regarding whether there is a probability that [Renteria] would commit criminal acts of violence that would constitute a continuing threat to society." He stated that he interviewed Renteria about his family, his background, his childhood extracurricular activities, his prison experience, and his employment history. However, he did not ask Renteria any questions about the instant offense. When the prosecutor asked him why he did not do so, Cunningham responded:

Q.    And just so the Court knows, would you tell the Court why you did not inquire?

A.    Yes, sir.  Two primary reasons.  One, defense counsel had instructed that the defendant was not to be questioned about the instant offense or prior unadjudicated conduct.  Second, an inquiry --

THE COURT: About prior what conduct?

THE WITNESS: Prior unadjudicated conduct.  The second reason is that that information would not inform either of the two issues that I was looking at.  It would not tell me how he came to be damaged.  It would not inform what kind of inmate he would be confined on a capital life term in the Texas Department of Criminal Justice.  Beyond the facts of the offense that I'm accepting from his conviction and from the trial my inquiry of him beyond that doesn't inform any issue that's before me.

After voir dire examination, but before Cunningham's testimony before the jury, the parties discussed the Fifth Amendment issue at the bench:

[PROSECUTOR]:  This issue about inquiring into specific facts of the case, and I don't think he has the right to take the Fifth at that point.  I just -- is there a way you want to get into this area?

[DEFENSE COUNSEL]:  Well, the defendant has a right to invoke the Fifth Amendment protection, and it was done through counsel, and it's improper to comment on it in any fashion, to comment on his invocation of his Fifth Amendment right.

[PROSECUTOR]:  Well, except that he's going to say that he interviewed him and then he didn't interview him in certain areas.

[DEFENSE COUNSEL]:  That he what?

[PROSECUTOR]:  That he interviewed him, but he didn't interview him in the area of the instant offense.

[DEFENSE COUNSEL]:  That's a comment on the Fifth Amendment right.  I mean it's that simple.

THE COURT: So what is your objection or --

[PROSECUTOR]: Well, I believe that I --

THE COURT: -- what you're wanting me to rule on?

[PROSECUTOR]: -- I believe I'm entitled to inquire that he did not answer, that it was not a complete interview, and he asserted his Fifth whether there was counsel or not, that he asserted his Fifth, that he was not able to get those facts from him.

[DEFENSE COUNSEL]: That's improper evidence for the jury.

THE COURT: All right. Well, we're not -- we're not even at your portion of the questioning anyway.

[PROSECUTOR]: Okay.

THE COURT: So let's get the testimony from him on direct. And then when it's time to begin your cross-examination we can approach the subject again.

Cunningham then testified before the jury. When defense counsel asked him to describe the "primary area that [he was] asked to focus on in David Renteria's case," he responded:

> Stated most simply, it was where do we go from here, what kind of . . . inmate is he likely to be in prison, and even more specifically, what's the likelihood that he would commit acts of serious violence [if] confined for life in the Texas Department of Criminal Justice.

Cunningham opined that there was "not a probability" that Renteria would commit criminal acts of violence in prison if he were to receive a life sentence instead of the death penalty. He testified that his opinion was based in part on his interview of Renteria. He explained that he interviewed Renteria about his prior confinement in jail and prison, his educational

history, his history of extracurricular activities, his occupational history, his parents' marital history, and his own dating and marital history. The prosecutor asked, "You did not question the defendant regarding the capital offense?" Defense counsel objected to the question because "[i]t invades the defendant's right to invoke his Fifth Amendment." The trial judge overruled the objection, and Cunningham responded, "I did not." The parties then approached the bench and the prosecutor stated, "My next question, Your Honor, is the defendant refused to answer any questions regarding the capital murder offense." The trial judge sustained defense counsel's objection to that question, but ruled that the prosecutor could ask Cunningham "why he did not ask [Renteria] about the capital murder offense."

The prosecutor then continued his cross-examination of Cunningham. Over defense counsel's objection, the prosecutor asked Cunningham why he did not question Renteria regarding the capital offense. Cunningham responded that he did not question Renteria about the offense because defense counsel instructed him not to do so and because "there is nothing about that inquiry" that would show "how he became to be [sic] damaged" or "what kind of inmate he's likely to be in the future."

If a defendant breaks his or her silence to speak to his own psychiatric expert and introduces testimony that is based on that interview, then the defendant has constructively taken the stand, thereby waiving the Fifth Amendment right to remain silent.[84] The focus of

---

[84] *Chamberlain,* 998 S.W.2d at 234 (citing *Lagrone v. State,* 942 S.W.2d 602 (Tex. Crim. App. 1997); *Soria v. State*, 933 S.W.2d 46 (Tex. Crim. App. 1996)).

the analysis is the defendant's choice to break his or her silence.[85]  The issue is whether the psychiatric testimony that the defendant intended to introduce was based on his or her own participation in the psychiatric testing and examination.[86]  Here, Renteria introduced psychiatric testimony based upon his own participation in a psychiatric examination.  This constituted a waiver of Renteria's Fifth Amendment privilege in the same manner as would his election to testify at trial.[87]

Renteria argues that under *Soria v. State,* the scope of the State's cross-examination is "limited to the issues raised by the defense expert."[88]  Renteria points out that Cunningham "did not question [him] about the offense and did not testify to any conversations with [him] about the offense."  Thus, Renteria contends that he "did not raise any issues that would open the door" for the State to cross-examine Cunningham as to why he did not question Renteria about the offense.

The State did not exceed the scope of proper cross-examination.  Defense counsel called Cunningham to testify that Renteria would not be a future danger in prison.  It was permissible for the State to test Cunningham's credibility by questioning him as to how he arrived at that conclusion.  A criminal defendant may not testify through a defense expert and

---

[85]  *Id.*

[86]  *Id.*

[87]  *See id.* (citing *Soria,* 933 S.W.2d at 54).

[88]  933 S.W.2d at 58.

then use the Fifth Amendment as a shield against cross-examination on disputed issues.[89]

Point of error forty-two is overruled.

## VII.  Exclusion of Parole Evidence

In point of error one, Renteria challenges the trial judge's exclusion of "evidence of the minimum amount of time [that he] would spend in prison."  Renteria complains that the excluded evidence was "highly relevant" to the future dangerousness special issue.  He further asserts that the exclusion of this evidence violated due process, destroyed his mitigation argument, and "pushed the jury towards death."

In a hearing outside the presence of the jury, defense counsel presented the testimony of William T. Habern, an attorney whose practice focused on matters of sentencing and post-conviction remedies.  Defense counsel presented evidence that, following the revocation of his probation, Renteria was sentenced to twenty years for indecency with a child and ten years for felony DWI on June 10, 2002.  His ten-year sentence was ordered to run consecutively with his twenty-year sentence.  Defense counsel also presented evidence that the State had filed a "Motion for Cumulation of Sentences," requesting that the trial judge to stack the life sentence on top of the twenty-year and ten-year sentences in the event that Renteria was sentenced to life in the instant case.

Habern opined that Renteria "would never parole" because "[o]btaining parole on a capital life murder is next to impossible in Texas."  Habern also responded to defense

---

[89]  *Lagrone,* 942 S.W.2d at 611.

counsel's questioning as follows:

> Q.     And what is the likelihood that the inmate we're talking about doing a 20 with a ten stacked on it and a life stacked on those is going to do less than 20 years on the 20 year sentence by the Parole Commission . . . issuing an order that that sentence cease to operate?
>
> A.     Unless there were drastic changes in the way the system works -- and I can't predict the future -- there is next to no chance he would be paroled.
>
> Q.     What are the chances that this inmate, that the Parole Commission would cause the ten year sentence to cease to operate before a full ten?
>
> A.     Next to nothing.
>
> Q.     What are the chances that the Parole Commission would cause a life sentence to cease to operate at any time before that one expires of its own accord?
>
> A.     I would be very very seriously surprised if parole were granted in serious cases.

Habern also opined that Renteria "would have to do all 70 years" before being considered for release on parole, and he did not believe that Renteria would actually be released on parole at that point. Habern was further questioned by defense counsel about parole eligibility:

> Q.     So hypothetically speaking, if the Court -- if the jury gives a life sentence and this Court cumulates that sentence on those other two, does the Parole Commission or anyone else have the discretion or the authority to cause a 20-year sentence to cease to operate at any time before 20 years day per day?
>
> A.     They have the discretion to.
>
> Q.     And at what point do they have the discretion to cause the 20-year sentence to cease to operate?

A.      My recollection of that is that when he is parole eligible they have the opportunity to parole him.

Q.      And when is that?

A.      My recollection is it's ten years.  It's not a 3-G offense.  I'm subject to being corrected, but I believe it's 50 percent.  It may be earlier.  But none the less, in a situation that's been identified for me to consider here parole boards are not going to parole him.

Q.      And on the ten year sentence, when does the board have discretion to cause that sentence to cease to operate?

A.      I was thinking it's two years seven months but it may be two and a-half.  I'm not sure.

Q.      If the indecency is not a 3-G, when will the discretion of the board arise after how many years?

A.      When he had earned one fourth of the sentence.

Q.      So that would be five years?

A.      Well, yes, when he earned five.

Q.      And then on the ten year sentence at one fourth is two and a-half?

A.      Yes.

Q.      So he could conceivably after he does five on the 20 cause that sentence to cease to operate and have him start on the ten?

A.      That's correct.

Q.      And after two and a-half on that one cause it to cease to operate and he starts the life sentence?

A.      That's correct.

Q.      And he's got to do 40 on the life?

A.     That's correct.

Q.     So the leasts [sic] number of years that he could do under any circumstances would be 40 plus five plus two and a-half?

A.     That's correct.

     [DEFENSE COUNSEL]: That's 47 and a-half years.

On cross-examination, Habern acknowledged the speculative nature of his testimony:

Q.     And [the statute] basically says that the jury is not to consider parole because parole authorities, the eligibility of parole is no guarantee because basically it's up to prison officials?

A.     It's not up to prison officials.  It's up to parole officials.

Q.     Parole officials.  I stand corrected.  Up to parole officials?

A.     That's correct.

Q.     And everything is speculative sometimes when you make a request on behalf of one of your clients the Parole Board will grant them parole and you might even be surprised that they did it on that occasion and while others they denied and you think wow, I thought they were going to grant it.  Isn't that fair?

A.     That's correct.

Q.     And just for the record, I know you know this, but just for the record, the possibility that one, that this defendant would get a life sentence versus a death sentence, one, is speculative?

A.     Sure.  That's in the jury's hands.

Q.     And if the defendant were to receive a life sentence, 40 calendar years before [being] eligible for parole, the possibility that the Judge would stack that sentence over any other sentence existing is also speculative?

A.     That's absolutely correct.

Q.     And any testimony you were to provide to a jury would be in that regard speculative?

A.     Yes, based on the hypothetical that was posed to me when I started my testimony.

                    *          *          *

Q.     I'm not talking about the 40 year life because that, I think we've agreed that the 40 year life sentence is really speculative, especially in this case since we haven't even got there?

A.     That's right.

Q.     So I'm just talking about the 20 and the ten.  And all of that, when he would be released is all really in the hands of prison officials and the Parole Board?

A.     That's absolutely correct.

Q.     And the Judge is absolutely right when she says application of those laws, meaning the parole laws will depend on the decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted?

A.     That is true in all three.

The prosecutor objected that the proffered testimony was speculative and should not be considered by the jury.  Defense counsel responded that the evidence was necessary to inform the jury that, if Renteria received a stacked life sentence, then the "40-year minimum becomes a myth" and he would have "to do more than 40 [years]" before becoming eligible for release on parole.  The trial judge excluded the proffered testimony.

Habern did not testify before the jury; however, defense witness AuBuchon testified

about Renteria's prior sentences as follows:

> He currently last [sic] a 20-year sentence for indecency with a child, offense was committed about 1992 with commence date of sometime in 2001.
>
> Then there's a ten year felony DWI that started I believe in the early 2000 [sic] that will not be up until the 10-year sentence seizes [sic] to operate. So the ten is consecutive to the 20. Then I saw the commitment for the capital murder death sentence.

The State objected that "this is in violation of the Court's order," and also added:

> Your Honor, regarding the Court's order on Mr. Habern's testimony about when these sentences will run and how they will run, going into this information suggests to the jury that it will be 20 years before the ten year sentence starts, which puts me in the position of having to ask this witness well, but that's not true because there's parole, which I'm not going to go into.
>
> So I'd ask that this question and this response be struck because it is an improper assessment of what exactly will happen. It leaves a false impression with this jury that cannot be cured without going into parole.

The trial judge sustained the objection, struck AuBuchon's answer from the record, and ordered the jury not to consider it. The indecency judgment and the felony DWI judgment were later admitted into evidence. Both judgments showed that the 20-year indecency sentence and the 10-year felony DWI sentence were to run consecutively. At the State's request, the felony DWI judgment was redacted to delete language indicating that the 10-year sentence would commence when the 20-year sentence ceased to operate.

Before 1999, parole was not a proper matter for the jury's consideration in any form.[90] Effective September 1, 1999, the Legislature amended Article 37.071 of the Texas Code of

---

[90] *Hankins v. State,* 132 S.W.3d 380, 384 (Tex. Crim. App. 2004).

Criminal Procedure to provide that a jury could be instructed on a capital defendant's eligibility for parole. The applicable law in the instant case authorized a trial judge, on written request of defense counsel, to instruct a jury on a capital defendant's parole eligibility as follows:

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.[91]

This amended statute was narrowly drawn and did not render every aspect of parole law an issue for jury consideration.[92] It expressly discouraged speculation on the parole process.[93] The Legislature could have written it more broadly to impart more information but chose not to.[94] Thus, parole is not a proper issue for jury consideration except to the extent explicitly provided for in Article 37.071, Section 2(e)(2)(B).[95]

The jury was instructed in accordance with Article 37.071, Section 2(e)(2)(B). Habern's speculative testimony was outside the scope of what was permitted by that statute.

---

[91] TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(2)(B).

[92] *Hankins,* 132 S.W.3d at 385.

[93] *Id.*

[94] *Id.*

[95] *Id.*

Thus, the trial judge did not abuse her discretion in excluding it.[96] Further, no harm is shown by the exclusion of Habern's or AuBuchon's testimony.[97] Defense witness Cunningham testified that he believed Renteria would "die in prison" and would "never be at large in the community." Further, defense counsel argued at closing that it was undisputed that Renteria would spend the rest of his life in prison and would die in prison. Point of error one is overruled.

## VIII. Denial of Parole Instruction

In point of error thirty-nine, Renteria argues that the trial judge improperly denied his requested jury instruction regarding parole. Renteria specifically complains that the trial court should have granted his request to instruct the jury that: he had been previously sentenced to twenty-years for indecency with a child and ten years for felony DWI; his ten year sentence would not begin to operate until his twenty year sentence ceased to operate; and if he were sentenced to life in the instant case, then his life sentence would not begin to operate until the two prior sentences ceased to operate.

As previously discussed, parole is not a proper issue for jury consideration except to the extent explicitly provided for in Article 37.071, Section 2(e)(2)(B).[98] Here, the jury was properly instructed in accordance with Article 37.071, Section 2(e)(2)(B). Renteria's

---

[96] *See Shuffield v. State,* 189 S.W.3d 782, 793 (Tex. Crim. App. 2006).

[97] TEX. R. APP. P. 44.2.

[98] *Hankins,* 132 S.W.3d at 385.

speculative and potentially incorrect proposed instruction was outside the scope of what was permitted by that statute.

In this same point of error, Renteria also complains that the trial judge erroneously denied his requested jury instruction "regarding the Texas Department of Criminal Justice." That request involved instructing the jury not to "speculate" whether Renteria would commit violent acts in prison and to "presume" that the Texas prison system would "competently carry out its responsibility to safely and securely house the defendant and other prisoners in the system should he be sentenced to life in prison." Renteria makes two distinct arguments in one point of error, and he fails to provide legal authority in support of this particular claim. Thus, we decline to address this portion of his argument because it is multifarious and inadequately briefed.[99] Point of error thirty-nine is overruled.

## IX. Improper Jury Argument

In point of error forty, Renteria argues that the prosecutor made an improper jury argument that misstated the evidence and misled the jury. At issue is the following portion of the prosecutor's closing argument regarding the future dangerousness issue:

> [PROSECUTOR]: And when you're -- when you're looking to answer this, I don't shy away from the fact that the State of Texas must prove this beyond a reasonable doubt. I think the evidence is overwhelming, overwhelming that he is a continuing threat.
>
> When we watch him 365 days a year, he's a good boy. We can't watch him 365 days a year every day of the week, every hour of the year. We can't do that.

---

[99] TEX. R. APP. P. 38.1.

And he is a continuing threat. He does not deserve the right to go to general population. We have no idea what kind of circumstances, crisis, that he might find possible, and then we'll see this. We'll see this.

And they want to equivocate that continuing threat, the threat -- it doesn't have to be another homicide. It can be a variety of violent conduct and threat. Whether you want to give him credit for living in that prison society or in the free world. But obviously even Dr. Cunningham -- and I don't agree with much of what he says -- but Dr. Cunningham says that in the free world he is a continuing --

[DEFENSE COUNSEL]: Objection, Your Honor. Outside the record. The unrebutted testimony is that Mr. Renteria, if he gets a life sentence, he's going to be in prison his whole life.

THE COURT: Overruled.

[PROSECUTOR]: There's no evidence in there that he'll be in there his whole life. You can read that record all you want. There's no evidence of that.

Defense counsel objected when the prosecutor stated that Cunningham testified Renteria would be a continuing threat in the free world. But that is not what Renteria is complaining about on appeal. Here, he asserts that the trial judge improperly "permitted the State [to] argue that there was no evidence appellant would likely be in prison for the rest of his life." However, defense counsel did not object when the prosecutor argued that "[t]here's no evidence that he'll be in there his whole life." Thus, Renteria has failed to preserve his right to complain about this particular argument on appeal.[100] Point of error forty is overruled.

---

[100] *See* TEX. R. APP. P. 33.1.

## X. Death Penalty Statute

Renteria's remaining points of error consist of various challenges to Article 37.071 of the Texas Code of Criminal Procedure. In point of error forty-three, Renteria argues that the trial judge erred by instructing the jury, as required by the statute, that the definition of mitigating evidence limits the concept of mitigation to "evidence that a juror might regard as reducing the defendant's moral blameworthiness." In points of error forty-four, forty-five, and forty-eight, he complains about the statute's failure to define the phrases "continuing threat to society," "criminal acts of violence," and "militates." In point of error forty-six, he contends that the Eighth and Fourteenth Amendments were violated because the trial judge, in accordance with the statute, "failed to provide a vehicle for a juror to return a life verdict where the aggravating factors are not so severe as to call for death." In point of error forty-seven, he argues that the "10-12 rule" is unconstitutional and that the trial judge violated his rights by instructing the jury in this manner. In point of error forty-nine, he complains that the statute should require the State to bear the burden of proof and persuasion with regard to the mitigation issue.

We have repeatedly rejected these arguments, and Renteria fails to persuade us that our prior decisions were incorrect.[101] Points of error forty-three through forty-nine are

---

[101] *See Mays v. State,* 318 S.W.3d 368, 397 (Tex. Crim. App. 2010), *cert. denied,* No. 10-8172, ___ S. Ct. ___, (Mar. 7, 2011); *Russeau v. State,* 291 S.W.3d 426, 434-36 (Tex. Crim. App. 2009); *Smith v. State,* 297 S.W.3d 260, 278 (Tex. Crim. App. 2009), *cert. denied,* 130 S. Ct. 1689 (2010); *Murphy v. State,* 112 S.W.3d 592, 606 (Tex. Crim. App. 2003); *Cantu v. State,* 939 S.W.2d 627, 649 (Tex. Crim. App. 1997).

overruled.

The judgment of the trial court is affirmed.

DATE DELIVERED: May 4, 2011
DO NOT PUBLISH